**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

**SARAH REITER,**

      Plaintiff

**v.**

**THE CLASSICAL ACADEMY, a Colorado Charter School**

      Defendant.

## COMPLAINT

COMES NOW Plaintiff, Sarah Reiter, and for her Complaint against Defendant, alleges the following:

### Introduction

1. This is an action brought pursuant to § 504 of the Rehabilitation Act, 29 U.S.C. § 794, for retaliation.

### Jurisdiction

2. The Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. §§ 1331 & 1343.

### Parties

3. Sarah Reiter is a resident of Colorado Springs, Colorado who was formerly employed by The Classical Academy.

4. The Classical Academy (hereafter "TCA") is a Colorado Charter School.

5. At all times relevant to this Complaint, TCA received federal funding that supported TCA's programs for educating students.

6. At all times relevant to this Complaint, TCA was a "program or activity" that received federal funding.

## Venue

7. Venue is proper in the U.S. District Court for the District of Colorado as the acts and omissions giving rise to Plaintiff's claim occurred in Colorado Springs, Colorado.

## General Allegations

8. Sarah Reiter is a dedicated and experienced educator.

9. Ms. Reiter has worked in elementary education for over 21 years in Colorado and Washington.

10. Ms. Reiter worked for Academy School District 20 as an education specialist from 2014 to 2017 when she was hired by TCA.

11. During her years of work in education, Ms. Reiter received regular training on special education laws, crisis prevention and training, and the rights of students with disabilities.

12. Ms. Reiter worked as a Title I coordinator and interventionist for three years before going to work for TCA.

13. In her role as the Title I coordinator and interventionist, Ms. Reiter provided training on interventions for students with disabilities and worked extensively with students with disabilities.

14. In August 2017, Ms. Reiter was hired by TCA to work as the assistant principal at its North Elementary campus.

15. Throughout her tenure with TCA Ms. Reiter strived to ensure that the school complied with the requirements of federal law and work to ensure that students with disabilities were treated fairly, equally, and consistent with the requirements of the law.

16. In April 2018, Ms. Reiter learned that TCA staff were treating A.K., a student with disabilities, in a manner that was inconsistent with A.K.'s Individualized Education Plan ("IEP").

17. Ms. Reiter believed that the staff's treatment of A.K. could result in A.K. being denied educational opportunities at TCA.

18. Ms. Reiter learned that a TCA paraprofessional/tutor was imposing unnecessary discipline on A.K. as a result of behavioral issues caused by her disability.

19. An example of the disciplinary action imposed on A.K. by the paraprofessional/tutor was the requirement that A.K. clean the cafeteria floor.

20. Ms. Reiter believed that requiring A.K. to clean the cafeteria floor as a form of discipline was unwarranted, degrading, and unduly harsh, particularly in light of the fact that A.K.'s disability caused the behavioral issue for which she was being disciplined.

21. Ms. Reiter also learned that A.K.'s Spanish teacher was singling her out for negative attention in class due to behavioral issues caused by her disability.

22. On April 17, 2018, Ms. Reiter sent an email to TCA employees advocating on behalf of A.K.

23. Particularly, Ms. Reiter's email explained that the student, A.K., has problems with reasoning and emotional regulation.

24. Ms. Reiter's email about A.K. went on to state that due to A.K.'s problems with reasoning and emotion regulation, adults may perceive A.K. as behaving in a defiant or inappropriate manner when in fact A.K. was disconnected from accessible skills.

25. Ms. Reiter's email sought suggestions from the staff for how to provide additional help or accommodations to A.K.

26. Ms. Reiter's email about A.K. also suggested informing staff of how to deescalate A.K.

27. In her email about A.K., Ms. Reiter requested that the staff help her come up with some ways to keep consistency in what A.K. heard from them throughout the school day.

28. Ms. Reiter's email about A.K. sought changes and improvements in the services provided to A.K. by TCA staff.

29. Ms. Reiter's email about A.K. sought to ensure that A.K. received appropriate accommodations and educational opportunities.

30. Ms. Reiter sent the email about A.K. because of her concerns that the treatment A.K. was receiving from TCA staff was noncompliant with federal law concerning treatment of students with disabilities.

31. TCA administrator Don Stump and classroom teacher Kristi Roberts were copied on Ms. Reiter's April 17, 2018 email.

32. Don Stump was TCA's principal.

33. Kristi Roberts was a teacher at TCA.

34. Ms. Reiter copied Ms. Roberts on the email because Ms. Roberts was the supervisor of the paraprofessional/tutor who had disciplined A.K. and Ms. Reiter wanted to

ensure that Ms. Roberts was aware of the issues with how A.K. had been treated by the paraprofessional.

35. On April 19, 2018, Ms. Reiter emailed TCA staff on the Special Services Support Team seeking suggestions about how to better support teachers who were dealing with significant behavior issues from special needs students, and offered to be "put into a rotation" to work with students and give the teachers a reprieve from working with special needs students.

36. Ms. Reiter's offer to substitute for teachers and take over some of their responsibilities for working with special needs students was not part of Ms. Reiter's required duties as the assistant principal.

37. At the time Ms. Reiter made the offer to take over some of the responsibilities for working with special needs students because TCA did not have sufficient staff numbers or sufficiently trained staff to work with all the students with disabilities.

38. Ms. Reiter believed that TCA was understaffed with professionals who could work with students with more significant disabilities or health impairments because TCA did not want to offer services to disabled students.

39. On April 20, 2018, Ms. Reiter again engaged in conduct advocating on behalf of A.K.

40. On April 20, 2018, Ms. Reiter asked that staff who work with A.K. be updated on all of A.K.'s accommodations and that all staff use the same phrases to re-direct A.K. with consistency.

41. Ms. Reiter made her April 20, 2018 requests to ensure that A.K. received appropriate educational services and accommodations.

42. Ms. Reiter's suggestion that all staff use the same phrases to re-direct A.K. with consistency would be a more successful strategy for addressing A.K.'s reaction when being corrected by teachers or staff.

43. On April 20, 2018, Ms. Reiter also reiterated to staff that A.K. should not be disciplined by being required to clean the cafeteria floor.

44. Ms. Reiter also directed the staff to contact her prior to imposing disciplinary consequences on A.K.

45. Ms. Reiter determined that she needed to be involved before staff issued any disciplinary measures to A.K. because A.K.'s behavioral issues were caused by her disability, and were not the result of misconduct, and Ms. Reiter did not want students disciplined as a result of their disabilities.

46. At around the same time that Ms. Reiter was working to ensure that A.K. was provided with appropriate educational opportunities, she was also advocating for the rights of another student with disabilities, G.C.

47. In or around mid-April 2018, it was reported to Dorothy Simpson, TCA's Dean of Educational Philosophy, Elementary, that staff were having difficulty managing G.C.'s behavior.

48. G.C.'s behavioral issues were caused by his disability.

49. On April 20, 2018, Dorothy Simpson suggested to Ms. Reiter that TCA would be able to "get rid" of G.C. by recording a video of G.C.'s behavior and showing it to G.C.'s parents.

50. TCA's special education teacher at North Elementary School was present at the April 20, 2018 meeting.

51. Ms. Simpson told Ms. Reiter that TCA had a similar problem with the behavior of a student with disabilities at the East Campus, and the principal there, Amy Nelson, made a video recording of the student's behavior.

52. Ms. Simpson told Ms. Reiter to use her cell phone to record video of G.C. and send the video to G.C.'s parents.

53. Ms. Simpson told Ms. Reiter that Ms. Nelson showed the video recording of the disabled student to the parents, and the student was "gone in three days," a reference to the parent's withdrawal of the student from TCA.

54. Ms. Reiter objected to Ms. Simpson's suggestion that she record a video of G.C.

55. Ms. Reiter objected to Ms. Simpson's suggestion that she should use any means to "get rid" of G.C.

56. Ms. Reiter questioned the legality and ethics of Ms. Simpson's suggestion that she record a video of G.C. and use it to "get rid" of him because of his disability.

57. Ms. Reiter's principal was aware of Ms. Simpson's request that Ms. Reiter record a video of G.C.

58. Ms. Reiter's principal was also aware of Ms. Reiter's objection to recording a video of G.C. because of her concerns about the legality and ethics of doing so.

59. In April 2018, it was announced that Jody Peterson would be replacing Don Stump as the principal of TCA's North elementary school for the 2018-2019 school year.

60. On or about April 23, 2018, Ms. Reiter held a meeting with TCA Principal Don Stump, classroom teacher Kristi Roberts, the TCA school nurse, the TCA school counselor, and the TCA school psychologist.

61. The purpose of the meeting was to discuss information Ms. Reiter had learned about how A.K. was being treated by TCA staff.

62. During the meeting, Ms. Reiter specifically stated that A.K. could not be disciplined for "talking back," as that behavior was caused by A.K.'s disability.

63. Ms. Reiter also suggested that TCA find an alternative to A.K.'s Spanish class.

64. Ms. Reiter expressed concerns that the inappropriate treatment A.K. was being subjected to was causing her to miss instruction time and that A.K. was missing more classes than she was attending.

65. Ms. Reiter observed that the attitudes of the individuals present in the meeting were deliberately dismissive toward A.K. and Ms. Reiter's concerns about her educational opportunities, and that those in attendance seemed to prefer that A.K. leave TCA and go to school elsewhere.

66. Not long after Ms. Simpson suggested that Ms. Reiter record a video of G.C., the TCA PE teacher, Kim Romine, asked Ms. Reiter if it would be appropriate for Ms. Romine to record a video of a class in order to document behaviors for disciplinary action.

67. The class Ms. Romine asked about recording was the same class that G.C. was in.

68. When Ms. Romine asked about recording G.C.'s class, Ms. Reiter suspected that Ms. Simpson had suggested that Ms. Romine video G.C. in furtherance of her desire to "get rid" of G.C.

69. On April 24, 2018, Ms. Reiter had a meeting with Jody Peterson, the incoming principal for the next school year.

70. During the April 24, 2018 meeting, Ms. Peterson told Ms. Reiter she wanted Ms. Reiter to give her a three-year commitment to remain the assistant principal.

71. On April 25, 2018, Ms. Reiter contacted TCA's Compliance department about the issue of videoing G.C.

72. Ms. Reiter, Jenny Combs, Director of Special Education, and Cheri Birkey in the Compliance department discussed Ms. Reiter's concerns about the suggestion of videoing a student with disabilities and using that video as tool to encourage disenrollment of the student.

73. Ms. Combs and Ms. Birkey both stated that is was not proper or acceptable to video students as suggested by Ms. Simpson.

74. Ms. Reiter informed Don Stump that Ms. Combs and Ms. Birkey had stated that it was inappropriate to use video in the manner suggested by Ms. Simpson.

75. Ms. Birkey also told Ms. Reiter that Ms. Simpson's suggestion needed to be reported to Ms. Simpson's supervisor, Wes Jolly.

76. After her meeting with Ms. Birkey and Ms. Combs, Ms. Reiter emailed Ms. Romine to inform her that it was inappropriate to video students for purposes of discipline. Mr. Stump was copied on that email.

77. On April 26, 2018, the day after Ms. Reiter contacted TCA's Compliance department with her objections about making a video to use to "get rid" of G.C., Ms. Reiter was informed that her contract would not be renewed for the 2018-2019 school year.

78. When Ms. Reiter was informed that her contract would not be renewed, she was told that "TCA is not a good fit" for her.

79. Up until the time that Ms. Reiter had started advocating for A.K. and G.C. in mid-April 2018, TCA had no concerns about the "fit" between it and Ms. Reiter.

80. TCA also had no concerns about the "fit" between it and Ms. Reiter when Ms. Peterson asked Ms. Reiter on April 24, 2018 to commit to working for TCA for three years.

81. The non-renewal of Ms. Reiter's contract was a termination of her employment with TCA.

82. TCA made the decision to not renew Ms. Reiter's contract because of her advocacy on behalf of students with disabilities.

83. Ms. Reiter was subjected to unlawful retaliation because of her advocacy on behalf of students with disabilities.

84. As a result of the actions of Defendant, Ms. Reiter has suffered past and future economic losses, emotional pain, suffering, inconvenience, mental anguish, humiliation, and other non-pecuniary losses.

**FIRST CLAIM FOR RELIEF (Retaliation—Rehabilitation Act, 29 U.S.C. § 794)**

85. Plaintiff realleges all prior paragraphs and incorporates them herein.

86. Defendant TCA is a program or activity that received federal funding.

87. Defendant TCA is covered by § 504 of the Rehabilitation Act.

88. Section 504 of the Rehabilitation Act prohibits discrimination against students with disabilities.

89. Section 504 of the Rehabilitation prohibits retaliation against any individual who has opposed acts or practices made illegal by the Rehabilitation Act.

90. Ms. Reiter opposed discrimination against students with disabilities.

91. Ms. Reiter advocated for the rights of students with disabilities.

92. Defendant TCA did not renew Ms. Reiter's contract for the 2018-2019 school year and terminated her employment.

93. Defendant TCA did not renew Ms. Reiter's contract for the 2018-2019 school year and terminated her employment because of Ms. Reiter's opposition to discrimination against students with disabilities.

94. Defendant TCA did not renew Ms. Reiter's contract for the 2018-2019 school year and terminated her employment because of Ms. Reiter's advocacy for the rights of students with disabilities.

95. But for the protected activity that Ms. Reiter engaged in, her employment would not have been terminated.

96. As a consequence of Defendant TCA's illegal conduct, Ms. Reiter has sustained significant injuries, damages, and losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

a. Nominal damages;

b. Reinstatement and back pay, including loss of benefits and seniority, or front pay in lieu of reinstatement;

c. Nonpecuniary and compensatory damages, including damages for emotional distress and consequential damages;

d. Pre- and post-judgment interest at the highest rate allowed by law;

e. Costs and reasonable attorneys' fees; and

f. All other legal or equitable relief to which Plaintiff is entitled.

## Jury Demand

**Plaintiff requests this matter be tried by a jury.**

Respectfully submitted this 23rd day of April, 2020.

CORNISH & DELL'OLIO, P.C.

s/Ian D. Kalmanowitz
Ian D. Kalmanowitz, # 32379
Cornish & Dell'Olio, P.C.
431 N. Cascade Avenue, Ste. 1
Colorado Springs, CO 80903
Telephone: (719) 475-1204
Fax: (719) 475-1264
Email: ikalmanowitz@cornishanddellolio.com
Attorneys for Plaintiff

Plaintiff's Address:
1522 Tari Drive
Colorado Springs, CO 80921

12