DON THOMAS STUMP

Reiter v. TCA                                                                                        March 17, 2021

**Page 1**

```
                IN THE UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF COLORADO

                  Civil Action No. 20-CV-1150-RBJ
    _____
    Plaintiff(s):
    SARAH REITER
    vs.
    Defendant(s):
    THE CLASSICAL ACADEMY, a Colorado Charter School
    _____

    Scheduling Attorney for the Plaintiff Via Zoom:
    MR. IAN D. KALMANOWITZ, ESQ.
    Cornish & Dell'Olio, P.C.
    431 North Cascade Avenue, Suite 1
    Colorado Springs, CO  80903
    (719) 475-1204
    Atty. Reg. No. 32379
    ikalmanowitz@cornishanddellolio.com

    **Appearances continued on page 2**

          _____

                 ZOOM DEPOSITION OF DON THOMAS STUMP

                  Reported Remotely Pursuant to the
         Colorado Governor Issued Executive Order D 2020 019
                                 and
                     Colorado Secretary of State
            Notary Rules 8 CCR 1505-11, Section 1, Rule 5

                           March 17, 2021
```

**Page 2**

```
 1  APPEARANCES CONTINUED:
 2
    For the Defendant Via Zoom:
 3  MS. LINDSEY W. JAY, ESQ.
    Overturf McGath & Hull, P.C.
 4  625 East 16th Street
    Denver, CO  80203
 5  (303) 860-2848
    lwj@omhlaw.com
 6
 7  Also Present Via Zoom:
    Sarah Reiter
 8
 9  PURSUANT TO NOTICE, the Zoom deposition of DON THOMAS STUMP
10  was taken on behalf of the Plaintiff, pursuant to the
11  Colorado Rules of Civil Procedure, taken at the location of
12  the deponent in Colorado Springs, Colorado, at 1:00 p.m.,
13  remotely before Sandi K. Pelton, RPR, RMR, CRR.
```

**Page 3**

```
 1                        I N D E X
 2
 3  DEPOSITION WITNESS:                                    PAGE
 4  DON THOMAS STUMP
 5  Examination By Mr. Kalmanowitz:                          4
 6
 7
 8  DEPOSITION EXHIBITS MARKED:
 9    NO.   DESCRIPTION                                    PAGE
10    18  3/23/2018 Letter from Don Stump To                24
            Whom It May Concern
11
12
    DEPOSITION EXHIBITS MARKED:
13
      NO.                                                  PAGE
14
       14                                                    18
15
```

**Page 4**

```
 1         WHEREUPON, the following proceedings were had:
 2
 3                   DON THOMAS STUMP,
 4  the deponent herein, having been first duly sworn to state
 5  the whole truth, testified on the oath as follows:
 6
 7         MR. KALMANOWITZ:  Good afternoon, Mr. Stump.  My
 8  name is Ian Kalmanowitz.  I am Sarah Reiter's attorney.
 9  Nice to meet you virtually.  Before I get started, I have a
10  couple of preliminary matters I have to go through with you.
11  The first is that I have asked the court reporter to record
12  the video of the deposition.  She can't do that unless
13  everybody consents.  And, so, is it okay with you that we
14  record the video?
15         THE WITNESS: Absolutely. Yes.
16         MR. KALMANOWITZ:  Thank you.  Lindsey, is that
17  okay with you?
18         MS. JAY:  Yes.
19               (Recording started.)
20               EXAMINATION
21  BY MR. KALMANOWITZ:
22      Q.  Mr. Stump, we are doing these depositions a
23  little bit out of the ordinary, or I guess the new normal
24  now because of COVID, we are doing all of this remotely.
25  And, so, when we do these remotely like this, you are in one
```



Pelton Reporting Service, Inc.   (719) 578-2062
www.peltonreporting.com

EXHIBIT A

DON THOMAS STUMP

Reiter v. TCA                                                                 March 17, 2021

9

1   the -- the assistant principal that I hired before Sarah
2   Reiter, she took a job as a principal at another charter
3   school after one year.
4        Q.   Okay.  You -- were you involved in the decision
5   to hire Sarah Reiter?
6        A.   Yes, I was.
7        Q.   Who -- who was the person that made the ultimate
8   decision to hire her?
9        A.   I did.
10       Q.   Did you have any concerns about hiring Ms. Reiter
11  to be the assistant principal knowing that she had no prior
12  experience working as an assistant principal?
13       A.   No.
14       Q.   Does TCA provide new assistant principals with
15  training on the duties and expectations of the position?
16       A.   That was done by me.
17       Q.   So, you trained Ms. Reiter in the -- in the
18  duties and expectations of the assistant principal position?
19       A.   Yes.
20       Q.   Okay.  Can you give me a description of the kind
21  of training that you provided to her?
22       A.   That was several years ago.  So, I -- part of
23  that training was helping her understand charter school, how
24  we did things, and TCA specifically.  And just guiding her,
25  and responsibilities that I expected from the assistant

10

1   principal.
2        Q.   Did the training occur over a block of time
3   before the school year started, or was it throughout the
4   course of the school year?  What does the training look
5   like?
6        A.   It would have -- it would have been done over the
7   course of the year.  Just because she was hired fairly soon.
8   I mean, it was -- school was beginning fairly soon after she
9   was hired.
10       Q.   Okay.  So, you didn't -- it is not like she came
11  in for two weeks before school started and spent every day
12  with you getting training?
13       A.   No.
14       Q.   Did TCA offer to send Ms. Reiter to training with
15  District 20 on how to be an assistant principal?
16       A.   I don't -- I don't know that.
17       Q.   Okay.  All right.  I understand -- I am not going
18  to ask you any specific questions about your medical
19  condition.  But I understand from other testimony so far in
20  this case that you had a medical issue that caused you some
21  pretty significant health problems in the latter part of the
22  2016-2017 school year, and into the 2017-2018 school year;
23  is that right?
24       A.   That is correct.  Yes, I had bleeding on the
25  brain, so I had brain surgery in March of that previous

11

1   school year.
2        Q.   Okay.  So, March of 2017 you had surgery.  And
3   were you back to work full time for the 2017-2018 school
4   year?
5        A.   Yes, I was.
6        Q.   Did you need to use intermittent leave at all
7   during the 2017-2018 school year?
8        A.   Not that I am aware of, no.
9        Q.   Did you have any arrangement with TCA that you
10  could leave early or come in late during the -- during that
11  2017-2018 school year if there were any medical or health
12  reasons that caused you to need to be late or leave early?
13       A.   I -- I do not remember that happening, Ian.  I
14  don't know that there was any agreement.
15       Q.   Were there periods of time during that last
16  school year -- I am going to call it the last school year
17  instead of the 2017-2018 year to make things a little bit
18  easier.  It is less of a mouthful.  Is that okay?
19       A.   That is fine with me.  Thank you.
20       Q.   Great.  So, during that last school year, were
21  there any occasions where you needed to miss, you know, any
22  significant time off from work because of your medical
23  condition?
24       A.   No.
25       Q.   Okay.  Did you ever have to take any days off at

12

1   all during that last school year because of your medical
2   condition or your health?
3        A.   That was three years ago.  I don't remember.  I
4   may have taken a day off or so, but I was basically in
5   school that year.
6        Q.   Okay.  Did you have issues with loud noises or
7   bright flashing lights during that last school year?
8        A.   No.
9        Q.   Okay.  During that last school year, who was
10  responsible for monitoring Sarah Reiter's job performance?
11       A.   That was my responsibility.
12       Q.   Did you provide Ms. Reiter with performance
13  feedback?
14       A.   Yes, I did.
15       Q.   How frequently would you provide her with
16  feedback about her performance?
17       A.   I don't remember.  Like I say, that was several
18  years ago, and I don't remember the specifics of that.  So,
19  I would just say I don't remember.
20       Q.   That's fair.  I know that in public schools,
21  traditional public schools, there is generally a -- like a
22  two-part evaluation process for administrators, like a
23  mid-year and a year-end evaluation.
24            Does TCA have a process like that?
25       A.   At the time I was there, they did not.



DON THOMAS STUMP
Reiter v. TCA                                                                       March 17, 2021

### 13

1  Q. And my questions are about the time that your
2  employment and Ms. Reiter's employment overlapped. So,
3  during that last year, did TCA have any sort of formal
4  evaluation process in place for administrators like
5  assistant principals?
6  A. Yes.
7  Q. What do you recall, if anything, the formal
8  evaluation process was?
9  A. You know, I know we had -- we had a written form
10 that I filled out. I -- I could not tell you what -- what
11 is on that form. I -- because of my brain surgery, I have a
12 little -- a little trouble with my memory. And, so, I -- I
13 couldn't tell you what was on that.
14 Q. Okay. Is it --
15 A. I --
16 Q. Go ahead. I'm sorry. I cut you off.
17 A. No, I was -- I'm sorry. I am not supposed to
18 interrupt. But I -- I will have you know that I haven't
19 looked at those evaluation forms for three years. So, I
20 haven't made that a practice in my retirement.
21 Q. You haven't spent your retirement going through
22 old -- old assistant principal evaluations?
23 A. Oh, dear.
24 Q. Do you recall if the formal evaluation process
25 consisted of one evaluation or more than one evaluation for

### 14

1  the assistant principal during the school year?
2  A. I'm sorry, was that a formal evaluation more than
3  one time? Is that what you asked?
4  Q. You said that the TCA had a formal evaluation
5  process. Did that process require multiple evaluations
6  during the course of the school year?
7  A. No. We sat down and talked about things during
8  the year, situations that would come up, but it was never a
9  formal evaluation. That was done at year-end.
10 Q. During the course of that 2017-2018 school year,
11 do you recall how many times you sat down with Ms. Reiter to
12 have discussions about her performance?
13 A. No. No, I don't.
14 Q. Is there anything that stands out in your mind as
15 being a significant performance issue with Ms. Reiter during
16 her employment at TCA?
17 A. Could you repeat that, Ian?
18 Q. I will try. Is there anything that stands out in
19 your mind as being a significant issue with Ms. Reiter's
20 performance during her time at TCA?
21 A. One of the things that we communicated together
22 was the differences in being in a charter school with being
23 in a regular public school that she was accustomed to. So,
24 we talked about those things. I don't know if that was the
25 dominating thing or not, but I know that was one of the

### 15

1  things.
2  Q. Okay. What are some of the differences between
3  the regular public school and charter school that you recall
4  talking to Ms. Reiter about?
5  A. I don't remember.
6  Q. Okay. Did you participate in the decision to not
7  renew Ms. Reiter's contract for the following school year,
8  the 2018-2019 school year?
9  A. I did not.
10 Q. How did you find out about the decision to not
11 renew Ms. Reiter's contract at the end of the 2017-2018
12 school year?
13 A. I'm sorry, that was garbled. I couldn't
14 understand what you said during that.
15 Q. How did you find out that Ms. Reiter's contract
16 was not going to be renewed?
17 A. I was told by Wes Jolly that he was not going
18 to -- I had already turned in my resignation. I was going
19 to retire at the end of the year. And, so, I -- that's how
20 I found out, was from Wes.
21 Q. So, Mr. Jolly told you that he made the decision
22 that Ms. Reiter's contract was not going to be renewed?
23 A. Correct.
24 Q. During your 16 years -- let's talk about your 15
25 years. During your 15 years of employment at TCA, can you

### 16

1  remember any situations where the director of academic
2  services made the decision to not renew an assistant
3  principal's contract?
4  A. That was not something I was involved in. So, I
5  don't -- I don't know.
6  Q. Did you ever make a decision to not renew any
7  assistant principal's contract?
8  A. No.
9  Q. How did -- how did you learn from Mr. Jolly that
10 Ms. Reiter's contract was not going to be renewed?
11 A. He called me to his office and told me.
12 Q. Do you remember when it was that he called you to
13 his office?
14 A. I couldn't tell you when that was.
15 Q. Okay. Do you know if he told you about the
16 nonrenewal decision before he told Ms. Reiter?
17 A. Yes.
18 Q. And, so, is that a yes that he told you about the
19 nonrenewal before he told Ms. Reiter?
20 A. Yes.
21 Q. If he told Ms. Reiter on April 26th at a meeting
22 at 1:00 in the afternoon or 1:30 in the afternoon, does that
23 help you orient yourself as to when he might have told you
24 about the nonrenewal decision?
25 A. You know, I don't -- I don't know.



DON THOMAS STUMP

Reiter v. TCA                                                                                   March 17, 2021

**Page 17**

1  Q.  Okay.
2  A.  I would just be assuming if I were to say
3  anything.
4  Q.  Okay.  Do you remember talking with Ms. Reiter
5  about her having to go to a meeting with Mr. Jolly on
6  April 26th?
7  A.  No.
8  Q.  What did you tell Mr. Jolly when he told you that
9  he was not going to renew Ms. Reiter's contract?
10  A.  I -- I do not remember.
11  Q.  Did you thank Mr. Jolly for making the decision
12  to not renew Ms. Reiter's contract?
13  A.  Not that I know of.
14  Q.  Okay.  I am going to try and share a document
15  with you.  I will see if we can make this work.  Are you on
16  a laptop?
17  A.  Yes.
18  Q.  Okay.  Are you able to see that?
19  A.  Yes, I -- yes, I can.
20  Q.  Okay.  Do you need me to make it bigger, or can
21  you read it okay?
22  A.  If you could make it a little bit bigger, that
23  will be helpful, Ian.
24  Q.  How is that?
25  A.  Yes.  That's fine.

**Page 18**

1  Q.  Okay.  I can try to make it a little bit bigger
2  if you want.
3  A.  That would be helpful.  I could strain at this,
4  but -- that's good.  Thank you.
5  Q.  Okay.  We had some problems yesterday with me
6  having things too big.
7  A.  Well, in my old age I never find that a problem.
8  Q.  This is a -- this has been previously marked as
9  Exhibit 14.  This is a performance appraisal form for TCA,
10  right?
11  A.  Correct.
12  Q.  And this is the performance appraisal that you
13  did for Ms. Reiter at the end of the 2017-2018 school year?
14  A.  Yes.
15  Q.  Do you remember preparing this appraisal?
16  A.  Not specifically.  I prepared a lot of
17  appraisals.  I don't remember specifically sitting down and
18  doing this one.  I know I did it.
19  Q.  Did anybody -- do you recall if anybody else had
20  any input into this appraisal?
21  A.  They did not.  Nobody else had input into this.
22  Q.  Okay.  All right.  I am going to scroll down a
23  little bit and ask you a couple of questions about it.  So,
24  here under "judgment," the first bullet point, "Seeks input
25  from appropriate sources."

**Page 19**

1  You rated Ms. Reiter as a 2.  That means she met
2  standards, correct?
3  A.  Correct.
4  Q.  And you also rated her as meeting standards for
5  performing tasks with integrity?
6  A.  Correct.
7  Q.  On these comments here, you wrote that,
8  "Supporting the TCA policies and procedures was difficult,
9  as many were different from schools with which she had been
10  familiar."
11  And then there is the second comment here,
12  "Frustrations over some of our accepted charter school
13  practices led to conflict with other leadership."
14  Do you recall who those conflicts were with?
15  A.  I believe some of those were with the other
16  assistant principals.  We have three elementary schools
17  there.  And the elementary -- assistant principals worked
18  together, too.  And, so, that was where some of that
19  conflict was.
20  Q.  Okay.  Was there a conflict with any other
21  leadership, other than the assistant principals?
22  A.  I don't have specific memory of that.
23  Q.  Okay.
24  A.  I would just be -- I don't want to just try and
25  fill in some holes here.  I don't remember any others.

**Page 20**

1  Q.  Sure.  Do you remember any -- anything about any
2  of the conflicts with the other assistant principals?
3  A.  I couldn't tell you specifically what those were
4  now.
5  Q.  Okay.  Do you remember talking to Ms. Reiter at
6  all during the course of the school year about any of these
7  perceived conflicts with the other assistant principals?
8  A.  Sure.  I did.
9  Q.  Okay.  What do you remember talking to her about?
10  A.  Couldn't -- I couldn't give you specifics, Ian.
11  I don't know.
12  Q.  Okay.  Did you -- did you keep notes of those
13  types of meetings that you might have had with Ms. Reiter?
14  A.  I am sure I did.
15  Q.  Okay.  If you would have sat down with Ms. Reiter
16  to have a discussion about performance, would you have kept
17  notes of a discussion like that?
18  A.  Yes.
19  Q.  Okay.  Did you file those notes anywhere?
20  A.  I don't remember where those would be.  I -- I
21  don't -- I don't remember.
22  Q.  You didn't take any of those notes with you when
23  you retired, did you?
24  A.  No, I did not.
25  Q.  I figured, you know, if you weren't spending the

