WESLEY RAY JOLLY

Reiter v. TCA                                                        March 16, 2021

```
                                                          1
          IN THE UNITED STATES DISTRICT COURT

             FOR THE DISTRICT OF COLORADO

          Civil Action No. 20-CV-1150-RBJ
_____
Plaintiff(s):
SARAH REITER
vs.
Defendant(s):
THE CLASSICAL ACADEMY, a Colorado Charter School
_____

Scheduling Attorney for the Plaintiff Via Zoom:
MR. IAN D. KALMANOWITZ, ESQ.
Cornish & Dell'Olio, P.C.
431 North Cascade Avenue, Suite 1
Colorado Springs, CO  80903
(719) 475-1204
Atty. Reg. No. 32379
ikalmanowitz@cornishanddellolio.com

**Appearances continued on page 2**

          _____

              DEPOSITION OF WESLEY RAY JOLLY

           Reported Remotely Pursuant to the
     Colorado Governor Issued Executive Order D 2020 019
                           and
                Colorado Secretary of State
        Notary Rules 8 CCR 1505-11, Section 1, Rule 5

                     March 16, 2021
```

```
                                                          2
 1   APPEARANCES CONTINUED:
 2
     For the Defendant Via Zoom:
 3   MS. LINDSEY W. JAY, ESQ.
     Overturf McGath & Hull, P.C.
 4   625 East 16th Street
     Denver, CO  80203
 5   (303) 860-2848
     lwj@omhlaw.com
 6
 7   Also Present Via Zoom:
 8   Anica Midthun, with Cornish & Dell'Olio
     Sarah Reiter
 9
10   PURSUANT TO NOTICE, the Zoom deposition of WESLEY RAY JOLLY
11   was taken on behalf of the Plaintiff, pursuant to the
12   Colorado Rules of Civil Procedure, taken at the location of
13   the deponent in Colorado Springs, Colorado, at 1:30 p.m.,
14   remotely before Sandi K. Pelton, RPR, RMR, CRR.
15
16                 I N D E X
17
18   DEPOSITION WITNESS:                          PAGE
19   WESLEY RAY JOLLY
20   Examination By Mr. Kalmanowitz:              5
21
22
23
24
25
```

```
                                                          3
 1   DEPOSITION EXHIBITS MARKED:
 2   NO.   DESCRIPTION                            PAGE
 3    5    8/31/2017 Email String from TCA         23
          Wesley Jolly to TCA Sarah Reiter
 4
      6   Handwritten Notes -                      29
 5        Bates TCA 000094 - 000096
 6    7   Handwritten Notes -                      40
          Bates TCA 000093
 7
      8   12/5/17 Email from TCA Wesley Jolly      48
 8        to TCA Rebecca DeMeyer
      9   Handwritten Notes -                      54
 9        Bates TCA 000089 - 000092
10
     10   Handwritten Notes -                      72
11        Bates TCA 000400
12   11   4/26/18 Email String from TCA            78
          Wesley Jolly to TCA Jenny Combs and
13        others
14   12   Text Messages - Bates TCA 000116         94
15   13   4/25/18 Email String from TCA Sarah     100
          Reiter to TCA Wesley Jolly
16
     14   Performance Appraisal Form              106
17
     15   Wes Jolly Journal Entry                 108
18
     16   Response to Plaintiff's First Set       113
19        of Requests for Admission,
          Interrogatories, and Requests for
20        production of Documents to
          Defendant
21
22
23
24
25
```

```
                                                          4
 1   PREVIOUSLY MARKED DEPOSITION EXHIBITS REFERRED TO:
 2
 3    NO.                                         PAGE
 4
 5     2                                           70
 6
 7     3                                           92
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Pelton Reporting Service, Inc.   (719) 578-2062
www.peltonreporting.com

EXHIBIT

B

WESLEY RAY JOLLY

Reiter v. TCA                                                                                           March 16, 2021

                                                                17
1  individuals have looked at those.  Things such as some of
2  Aesop's Fables brought into class.  Some -- the Greek
3  mythology stories we will start getting into in elementary,
4  as you start moving into secondary, and our middle school
5  classes.
6       Q.  Okay.  Were you involved in the decision to hire
7  Sarah Reiter as the assistant principal at the North
8  Elementary school?
9       A.  I was in the interviews.
10              (Discussion off the record for
11              technical issues.)
12      A.  The question, Sarah Reiter was hired.  I
13 typically sit in, if I am available -- I conduct interviews
14 for our principals, for assistant principals, I usually sit
15 in the back of the room.  I say that I am a flower on the
16 wall just listening into the conversation so I can hear all
17 of the candidates that are -- that are interviewing.  And I
18 did sit in on Sarah's interview for assistant principal at
19 North Elementary.
20      Q.  Okay.  Who made the decision to hire her?
21      A.  Donald Stump made the decision to hire her.  All
22 principals make the decision, and they will bring forth a
23 name who they want to be the AP for that position.
24              And the way that works, just as when I hire a
25 principal, my boss has veto authority.  If he has sat in on

                                                                18
1  interviews, and he did not like something that came up in
2  those interviews, he has the ability to veto.  And I reserve
3  that same right for -- or I will raise questions.  But the
4  decision to hire is -- was Donald Stump's.
5       Q.  Okay.  Did you raise any questions at the time
6  that he brought forward Ms. Reiter's name as the candidate
7  that he wanted to hire?
8       A.  I did raise some questions at the time on the
9  candidate to Mr. Stump.
10      Q.  What questions do you recall raising?
11      A.  I raised concerns over Sarah Reiter's background
12 and her ability to understand the philosophical approach of
13 The Classical Academy.
14      Q.  What were your concerns about Ms. Reiter's
15 background?
16      A.  The background, specifically she had not, to my
17 recollection, been involved with a charter school.  She had
18 not been involved in the educational philosophy that I
19 described earlier of Charlotte Mason, the classical approach
20 via the trivium and Socratic seminar.
21              That did not come across to me in her application
22 and in her interview, so that was the question that I raised
23 at the time, that that is something that we need to think
24 about to understand if a person will be able to understand
25 the philosophical approach that TCA takes, because we are

                                                                19
1  not -- we pride ourselves on not being like other
2  traditional public schools.  That's why we are a charter
3  school, and a family's choice in here.  Those are the
4  questions that I raised at the time.
5       Q.  And then you said you also had questions about
6  her understanding of the school's educational philosophy?
7       A.  Yes.  Correct.  There are questions that are
8  asked about understanding the philosophy in an interview.
9  And those who have been more involved in a classical
10 approach to education, their answers are usually a little
11 bit different than those who are not.
12              And we are talking, I think, five -- four or five
13 years ago now.  So, the best of my recollection, that's what
14 I recall in having the conversation with Mr. Stump.  And,
15 again, I told him at the time that's something for him to
16 consider, but the decision to hire is his.  And when he
17 said, "This is the person that I am going to hire for the
18 job," Sarah Reiter started working at TCA.
19      Q.  Do you know if there are any other schools in the
20 region that also operate on a classical instruction model
21 similar to The Classical Academy?
22      A.  There are -- there are several other schools
23 that -- that work on a classical model.  Not necessarily the
24 same as ours.  Some are within this local area.  Others are
25 outside, you know, north of TCA.  Fort Collins area.  Denver

                                                                20
1  area.  But there is -- they all have their uniquenesses,
2  because I have visited many of them, and their classical
3  approach is a little bit different than ours.
4       Q.  Did you have any concerns about Ms. Reiter's lack
5  of experience as an assistant principal as being something
6  that should be considered about in her hiring process?
7       A.  I do not recall raising that concern.
8       Q.  Okay.  During the -- or I guess at -- during the
9  school year that Ms. Reiter worked for TCA, Mr. Stump had
10 some health problems related to a medical condition,
11 correct?
12      A.  That is correct.
13      Q.  Did those health problems predate the start of
14 the 2017-2018 school year?
15      A.  I believe that they emerged at the -- the
16 semester prior to that, but my time line on Donald
17 Stump's -- Don Stump's medical condition, I don't recall
18 exactly when.  I remember the situation surrounding it and
19 talking to staff about his medical condition and him coming
20 back.  I do not recall directly the time line of that.  But
21 it was -- he was still dealing with some of the aftereffects
22 of his medical condition when Sarah Reiter was assistant
23 principal.
24      Q.  Okay.
25              MS. JAY:  Ian, just for the record, we are in the



                                                                         57
1  happened to the actual notes that you took in that meeting.
2  And then these notes, then, after the January 5th meeting is
3  over, go into a second meeting with -- it looks like both
4  assistant principals.  I will scroll down quickly.  I will
5  ask you briefly about that before I start to ask you any
6  other questions.
7          Did you -- the "BK," I assume, stands for Bridget
8  Kingsford?
9     A.   That's correct.
10    Q.   And "JP" is Jody Peterson?
11    A.   That is correct.
12    Q.   Did you meet with Ms. Peterson and Ms. Kingsford
13 together, or were those separate meetings?
14    A.   Separate.
15    Q.   Okay.  Both on January 10th?
16    A.   Yes.  I can't read the top of the notes, but I
17 believe that that is when those were taken.  Because I
18 consolidated my scratchings from the meeting with Sarah
19 Reiter as I am -- I am trying to listen to what is being
20 said, and making some notes off to the side, and then later
21 I summarized those notes, because I knew that that was going
22 to lead to a follow-on discussion with the APs and
23 principals.  And this was my document to basically summarize
24 the main points from that conversation and to craft my
25 follow-up questions with the leadership team.

                                                                         58
1     Q.   Okay.  So, I did scroll down a little bit.  Are
2  you able to see the date of the second notes now?
3     A.   Yes.
4     Q.   Okay.  So, it is January 10th, just to confirm,
5  right?
6     A.   Yes.  That is correct.  And I did meet with them
7  separately.  I went to each of their schools and actually
8  met with them.
9     Q.   Okay.  All right.  I am going to ask you some
10 questions about the January 5th meeting with Ms. Reiter.  Do
11 you recall her asking for clarification about TCA's
12 philosophy and educational approach?
13    A.   Can I look at the full first page?  I mean, I can
14 see --
15    Q.   Absolutely.  If you want to read the note, you
16 tell me.
17    A.   I would -- just let me read through this first
18 page.
19    Q.   Sure.  Absolutely.  Tell me when you are ready
20 for me to scroll down, that way we can keep you reading.
21         (Brief pause.)
22    A.   Okay.  You can scroll down.  I am at No. 7.
23         (Brief pause.)
24    A.   Okay.  You can continue.
25         (Brief pause.)

                                                                         59
1     A.   It went too far.  15 to 16.  Okay.
2     Q.   All right.  So, do you want me to leave these up?
3     A.   Yes.  If you could.  If you could scroll back to
4  where it was for 1.
5     Q.   Okay.
6     A.   That is fine.
7     Q.   So, do you remember Ms. Reiter asking for
8  clarification regarding TCA's philosophy and educational
9  approach?
10    A.   There are many elements within this conversation
11 that reflect questions about our philosophical approach.
12 Item 1 where she is asking for the charter, because she
13 is -- to be honest with you, I have never had a staff member
14 ask me for our charter.
15    Q.   Okay.
16    A.   So, she is asking that so she feels she can
17 better explain our curriculum to staff.  In that discussion,
18 the whole curriculum discussion, and the RtI questions that
19 are listed in here, are all about philosophical approach.
20         And I -- in the meeting I clarified she is not
21 going to find anything specifically stating our curriculum
22 requirements within the charter.  That that is not the
23 detail that it gets into.  But I let her know that I would
24 provide the charter to her immediately when our meeting was
25 over.  And I think there is reference to that in a later

                                                                         60
1  email where I sent her the charter.  So, there were
2  philosophical grounding questions within the conversation we
3  had.
4     Q.   Okay.  Do you remember her discussing her
5  concerns about ensuring that the state -- that the TCA met
6  the requirements of the state READ Act?
7     A.   I do recall.  I am not sure if it is in this
8  specific meeting, but I do recall her having questions about
9  response to intervention, and how we are helping struggling
10 kids, and those factors.
11         And I also let her know at that time that we were
12 following the guidances provided to us by the district
13 regarding the READ Act, and students in their abilities, for
14 those students who are falling behind in reading or moving
15 ahead in reading.
16         So, there were questions related to RtI in how we
17 were responding to struggling students at earlier grades.
18 So, I would say, yes, there was some wrapped-up questions
19 about reading and potentially READ Act and RtI all in that
20 conversation.
21    Q.   Do you recall Ms. Reiter expressing concerns
22 about ensuring TCA's compliance with Section 504 of the
23 Rehab Act?
24    A.   I don't recall her specifically specifying 504 in
25 that meeting.  And I don't recall seeing it in my notes.



WESLEY RAY JOLLY

Reiter v. TCA                                                                 March 16, 2021

**Page 61**

1   And I probably would have put that in there if she had
2   specifically called out IDEA, or 504, or any specific
3   special education statute.
4              I do recall that the -- much of the
5   conversation -- or not much, but a portion of the
6   conversation was related to this idea of our RtI was, as I
7   put in my notes, cosmetic, or she used with other staff
8   members fake, and that we didn't really have an RtI program.
9              And I disagreed with that, because RtI has been an
10  emphasis item for TCA for -- when I moved into this job,
11  this was one of the first priorities that the previous
12  president said, "I want you to work with director of student
13  support services and our principals to make sure our RtI
14  program is meeting the needs of students."
15             And we spent a lengthy time making sure our RtI
16  was trying to -- was developed to help students succeed.
17  Sarah Reiter did not see it that way, and called what we
18  were doing was just fluff or fake.  And that was, again,
19  part of the conversation that had been happening the
20  previous four months to try and explain to her why our RtI
21  program was the way it was.
22             That it had been vetted by the district.  Our
23  READ Act processes were vetted by the district.  And I was
24  just letting her know that I didn't necessarily agree with
25  her point that she was making.

**Page 62**

1       Q.   Do you recall Ms. Reiter raising concerns about
2   compliance with the Individuals with Disabilities and
3   Education Act, the IDEA, during the January 5th meeting?
4       A.   I do not recall her mentioning, as I said before,
5   any specific reference to 504 or IDEA.
6       Q.   All right.  There is a -- I am going to scroll
7   down a little bit here and ask you about No. 11.  Are you
8   able to read that?
9       A.   Yes.
10      Q.   So, your notes indicate, "Teachers not
11  trained/certified.  Spent some time redirecting here."
12             So, do you recall Ms. Reiter raising concerns
13  that the teachers who have been ranked highly qualified
14  because of taking the Praxis test are at a disadvantage to
15  traditionally certified teachers because they don't have any
16  formal training in working with students with special needs
17  or intellectual disabilities?
18      A.   I do not recall Mrs. Reiter specifically talking
19  about Praxis and those qualifications.  I do remember a
20  lengthy discussion that began in the September, October time
21  frame, continued in this meeting, and then we continue again
22  at the end of the year of Mrs. Reiter saying that TCA staff
23  and teachers were not qualified to do what they do, and they
24  are not trained to do what they do.
25             And I had to redirect her in that we are a

**Page 63**

1   charter school.  Charter schoolteachers do not have to be
2   certified.  That is one of the things that makes charter
3   schools unique.  And she was adamant about the failings of
4   us not having 100 percent qualified and certified teachers.
5              That is not the case.  We probably have
6   40 percent of our staff who do not have a current
7   certification, yet we are one of the top-performing schools
8   in the state of Colorado.  And I let Mrs. Reiter know in
9   that conversation that she needs to -- it was denigrating of
10  our staff for her to say that we couldn't do our job because
11  we didn't have a piece of paper saying we were certified to
12  teach.  Specifically when charter schools are designed to
13  not have certifications.
14      Q.   So, but you don't remember her during any of
15  those conversations about the certification issue stating
16  that her concern is that when a teacher obtains a
17  traditional certification, they do coursework on teaching
18  students with disabilities, and that was one of the issues
19  she had with the lack of certification at TCA?
20      A.   She did not -- I do not recall her going to those
21  specifics.  I talked to her about my personal situation.
22  After 20 years in the military, I taught at TCA for seven
23  years.  I do not have a teacher certificate.
24             And I think most who are in my classroom would
25  say I did a pretty good job.  And I dealt with RtI plans.  I

**Page 64**

1   dealt with IEPs.  I dealt with 504s.  And it was all being
2   trained by our staff on how to deal with those things.  And
3   there were never any questions raised for me personally.
4              And that is the same situation that was being
5   raised about these students in our elementary classes.  It
6   is pretty clear that our staff do not have to have formal
7   training in those programs through a formal teacher
8   certification process to be teaching in our school.
9       Q.   Did it offend you as a former teacher who doesn't
10  have a certification that Ms. Reiter was raising concerns
11  about the lack of certifications of teachers?
12      A.   I don't know that I would use the term
13  "offended."  I would use the term that I think that I was --
14  I thought that my being able to use that for my own personal
15  perspective to give her an example of that -- that it is not
16  a requisite requirement for a teacher in a charter school.
17             I wouldn't use the word "offended."  I think it
18  was -- in effect, it helped me make my argument and my point
19  related to that.  She -- she -- Mrs. Reiter never agreed
20  with that.  It is evident through her ongoing conversations
21  about that, that she did not agree with that, regarding our
22  charter school and our charter requirements.
23      Q.   You never taught elementary school, correct?
24      A.   I have never taught elementary school, correct.
25      Q.   Okay.

WESLEY RAY JOLLY

Reiter v. TCA											March 16, 2021

65

1   A.   But I -- I will say I have not taught it, but I
2   have been in every classroom at TCA.  In one year I went to
3   all 240 classrooms for at least half an hour and sat through
4   them.  So, I am pretty familiar with the instruction that is
5   going on.
6   Q.   Let's talk about entry No. 8 on your notes.
7   A.   They have slid to the left again.  I don't know
8   if a mouse moved.
9   Q.   How is that?
10  A.   That is good.
11  Q.   Okay.  So, entry No. 8, what do you recall the
12  context of how that came up?
13  A.   This was, again, related to reading.  Spalding is
14  our reading curriculum for students.  And in the
15  conversation -- and, again, this conversation had been
16  happening with the elementary leadership team previously.
17       It was brought to my attention directly by Sarah
18  Reiter in my meeting that she -- one, she did not like our
19  reading program Spalding.  And she stated pretty directly
20  that she felt that Spalding was punishment, and she used
21  that multiple times, for kids that have reading deficits or
22  that struggle in reading.
23       We have been using that reading program for many
24  years.  And it is a -- been proven to be highly effective.
25  And the interesting thing is it is so highly effective that

66

1   the state of Colorado with the READ Act and struggling kids
2   just last year did a complete revamp and reviewed every
3   reading program in the state.
4        Spalding had to be submitted.  And actually TCA
5   was one of the schools that wanted Spalding to be one of the
6   reviewed programs, because if it was not on the approved
7   list, we would have to change our reading program.
8        As a result of that thorough review process by
9   the Colorado Department of Education, and I may be off on my
10  numbers, but on the initial review and approval, Spalding
11  was one of a handful, maybe five reading programs, that the
12  state approved for reading for kids because of the READ Act.
13       So, Spalding is an effective program.  It is
14  proven effective at TCA.  And it is far from punishing
15  children to have them go through that reading approach.
16  Q.   In the 2017-2018 school year, Spalding was not on
17  the READ Act approved list, right?
18  A.   There was not a READ Act approved list, to my
19  knowledge.  They decided that -- schools were doing whatever
20  reading program they wanted to do.  The state Board of
21  Education asked -- from my understanding, tasked CDE to do
22  an examination of reading programs to come up with an
23  approved list of programs that were sanctioned by the state
24  for reading.
25       So, I do not know that there was an approved or

67

1   nonapproved list prior to that time.  I do know that many
2   districts started submitting their request.  We have a
3   different reading program than the district.
4        So, at TCA, we wanted to make sure the program
5   that we thought was very effective and is being used by
6   charter schools and many schools throughout the country was
7   given a fair examination as a reading program.
8        So, now there is an approved list.  In 2017-'18,
9   I do not know if there was an approved list or not.  There
10  was -- it was not prohibited.
11  Q.   I think I may have misspoken.  And I -- I don't
12  know if you will know the answer to this.  But in 2017-2018,
13  there was a list of approved reading interventions for
14  students who are on READ Act plans, right?
15  A.   I do not know what was on the list in 2017-'18 as
16  far as its interventions.  I know that that is another area
17  that the state has looked at.  And I am not specific on -- I
18  know that there are different levels of intervention that
19  the reading programs are approved for, but I would have to
20  reference the CU website on that.
21  Q.   It is possible that Spalding's interventions were
22  not on the approved list for READ Act compliance in that
23  period of time?
24  A.   I cannot comment on that.
25  Q.   Okay.  Now, during your January 5th meeting,

68

1   Ms. Reiter wasn't saying that Spalding is punishment for all
2   students, was she?
3   A.   I believe the insinuation was that it was for
4   struggling students, all students, and that we needed to
5   look at a different curriculum.  I don't believe that she
6   approved of Spalding, but she did use the term "punishment."
7        And my recollection in looking at that in my notes
8   there, I think she put for students who have deficits.  And
9   there is a wide range of what a -- could be considered a
10  deficit in reading, is the READ Act has us identify the
11  students who are struggling.
12  Q.   Do you remember Ms. Reiter saying in that meeting
13  that giving the students with deficits more time with the
14  same lessons is like work without a purpose, which can be a
15  punishment?
16  A.   I do not recall that specific verbiage, no.
17  Q.   Okay.  Do you remember her raising the issue of
18  the Spalding as being problematic for students on IEPs?
19  A.   I don't believe our conversation specifically
20  revolved around 504 or IEPs, to be honest with you.  It was
21  more with response to the intervention process, which is a
22  precursor to 504s and IEPs in most cases.
23       And that was the crux of the discussion, because
24  for students who are struggling, we do have other options,
25  and I do not recall what they were in 2017 and 2018, that



WESLEY RAY JOLLY

Reiter v. TCA                                                                                                                              March 16, 2021

77

1      A.   Yes.
2      Q.   So, in that list, I assume AP refers to assistant
3  principal?
4      A.   That is correct.
5      Q.   There is a reference to "legalities with HR on
6  subs," and then in parens, "IEP."  What is that referring
7  to?
8      A.   I would have to defer to our director of HR on
9  that, but I believe that that is part of the situation that
10 I referred to earlier of the interaction with HR and Sarah
11 Reiter challenging who we were hiring for subs and their
12 qualifications, if I remember correctly.  And that is where
13 the director of human resources reached out to Don Stump and
14 raised a concern about that, and that was just a reference
15 to that.
16          I do not recall what the specific IEP reference
17 to that was, because that issue was one that did not come
18 directly to me.  It was handled through human resources
19 channels.
20     Q.   Could that have had something to do with a
21 request for a sub to cover for IEP meetings with the special
22 services committee?
23     A.   I have no knowledge of that, and I do not recall
24 that there was a request for such.
25          MR. KALMANOWITZ:  Okay.  All right.  Let me stop

78

1  this.  We are going to call this Exhibit 11.
2              (Deposition Exhibit 11 was marked.)
3  BY MR. KALMANOWITZ:
4      Q.   Sorry about how long that took.  Are you able to
5  read that?  Do you need me to adjust the size?
6      A.   Once it came up it was perfect and it shifted to
7  the left.
8      Q.   I didn't touch anything.
9      A.   It came up as the right size and everything.  So,
10 if you could shrink it a little bit, maybe.  It keeps --
11 again, it shrunk in size and it moved left to right again.
12     Q.   All right.
13     A.   I don't know why it is doing that.  I think if
14 you leave it right there, I can read everything.  Under --
15 it moved again.  There.  That's good.
16              (Brief pause.)
17     Q.   Let me know when you are done reading the email,
18 Mr. Jolly.
19     A.   I didn't know I was supposed to be letting you
20 know.  I have read it.  I read it.  I was waiting for a
21 question.
22     Q.   I was waiting for you to tell me you were done
23 reading it.  Okay.  We would have sat here all day.
24          So, I have got some questions for you about this.
25 You know, I want to start out with the first sentence.  "The

79

1  issue of videoing students has come up in several situations
2  recently."
3          What were the situations in which the issue of
4  videoing students had come up?
5      A.   I have a compliance specialist who handles a lot
6  of our questions of legality and policy.  Her name is Cheri
7  Birkey, Cheryl Birkey.  And she handles a lot of questions
8  and things that come from principals or APs or deans that go
9  to her.  And not all of them rise to my level, because some
10 of them are questions that she writes, she formats, proofs,
11 reviews our policies every year and does a lot of things on
12 the compliance end of things.
13          So, a lot of things come to her.  People ask her
14 questions.  And she will provide an answer.  Or she will let
15 me know that she is working an issue, and just so I am aware
16 of the issue.
17          In this particular case, I was made aware of an
18 elementary situation and a, I believe, junior high situation
19 where the question of videoing had been raised.  Videoing of
20 students.
21          I was given no particulars on what the situation
22 was concerning.  It was just that, "Hey, there are some
23 questions about videoing."  We had talked about this
24 previously as referenced with TS GOLD.  Our parent community
25 had serious concerns when the state created the kindergarten

80

1  readiness program.
2          And TS GOLD, one of the things that was a part of
3  that was using iPads to video students to demonstrate
4  behavior and other things.  And we had a big pushback from
5  our parent community about TS GOLD.  So, we actually
6  submitted and got wavered out of TS Gold from the state
7  board of education from using the video element of that
8  process.
9          So, that first line is me referring to Cheri
10 Birkey mentioning to me, "Hey, we have got a couple of
11 situations dealing with videoing.  I am crafting something
12 to make sure everyone knows we are on the same page."  And
13 that's -- that's the preface to this one.
14     Q.   Okay.  What does TS Gold stand for?  Do you know?
15     A.   TS Gold -- it is -- it is a company.  It is a --
16 it is a program for evaluating kinder readiness.  And that
17 is just the abbreviation for that.  I don't recall directly
18 what it stands for.
19     Q.   Okay.  So, Cheri Birkey brought to you the issue
20 of videoing students?
21     A.   Correct.  I was told about questions being raised
22 about videoing of students.
23     Q.   Okay.  Did Ms. Birkey tell you that there had
24 been multiple questions from Ms. Reiter related to requests
25 to video students?



Pelton Reporting Service, Inc.   (719) 578-2062
www.peltonreporting.com

                                                                          81
1    A.  No, she did not.  The only way that I found out
2  that Sarah Reiter was even involved in the questions, and at
3  that point it was after we had already crafted the
4  communication.  You can see the email string of when I was
5  brought into that.  I was brought into the conversation who
6  was actually making the queries after we had already
7  crafted, or were in the process of crafting these
8  guidelines.
9           And I was so strongly in agreement with Sarah
10 Reiter on this that she got these instructions before anyone
11 else on this email.  She was provided them.  I actually
12 directed Cheri Birkey -- once I found out that Sarah Reiter
13 was raising the question, I asked Cheri Birkey to send this
14 communication to Sarah and let her know that the entire
15 academic lead team, which is on this address, it will be
16 receiving it tomorrow.
17          And the next morning is when I sent it to
18 everyone else.  But that is when I -- so, when I was made
19 aware that Sarah was asking the questions about videoing, I
20 wanted to make sure that she got the response from Cheri
21 Birkey.  And Jenny Combs was coordinating on it also because
22 there is a specific line about student support services.
23 Because there had been situations historically where it is
24 written in a plan that a student can be videoed for certain
25 circumstances with parent approval.

                                                                          82
1           So, the communication was being coordinated
2  between myself, Cheri Birkey, and Jenny Combs-Divitto.  Then
3  I found out where one of the questions was coming from, and
4  was wanting to make sure that Sarah had the answer that she
5  was asking, because I thought I wanted her to be confident
6  in the idea that, yeah, I am not accepting of videoing of
7  students.
8    Q.  So, you -- you sent this email on April 26th.
9  When did you start working on this email with Ms. Birkey and
10 Ms. Combs-Divitto?
11   A.  I know that we sent -- if my recollection is
12 correct -- sent a copy of this verbiage to Sarah Reiter, I
13 believe on the 25th, when I was made aware where the
14 questions were coming from at that time it was sent there.
15          So, Cheri Birkey and Jenny Divitto-Combs were
16 crafting the response.  And I am not -- I am not specific on
17 the time line, because a lot was happening, as you are
18 aware, on April 24th -- 23rd, 24th, 25th, and 26th.  So, the
19 sequence of timing, without referring to my notes, from all
20 of the happenings on those days, which I don't have in front
21 of me, I can't tell you the specific time/date stamp of when
22 Cheri Birkey first reached out to me about the video and
23 this communication.  But I do know that was provided in the
24 documents to legal counsel.
25   Q.  Do you have notes that refer to the -- this

                                                                          83
1  videoing situation?
2    A.  I do not.  If -- I mean, I know you may not
3  believe this, but I provided every document that has Sarah
4  Reiter's name on it that involved me that I was aware of,
5  and there was no document referring to videoing, handwritten
6  or otherwise, other than these email strings.
7    Q.  The only reason I ask the question is because you
8  made a comment about not having your notes in front of you
9  to be able to talk about the time line.  And, so, it just
10 made me wonder if there were notes to talk about the time
11 line.
12   A.  No.  Those notes I am referring to is just making
13 sure I put the documents in proper sequence of when things
14 happened.  When I was, you know, creating a notebook that I
15 was providing to legal counsel, I went through and made
16 sure, okay, page 1 is April 14th.  Page 2 is this.  That
17 is -- that is the sequence I was referring to, not something
18 separate from that.
19   Q.  Okay.  Did Cheri Birkey give you specifics about
20 the concerns that Ms. Reiter was raising about videoing
21 students?
22   A.  The first I knew of Sarah Reiter, to the best of
23 my recollection, of anything related to videoing of
24 students, is when I received that first email that had
25 Sarah's name on it from Cheri Birkey when she was crafting

                                                                          84
1  this.  And, again, it is in the documents provided.
2           That is the first time that there was a
3  connection made between who was talking about videoing of
4  students, and one part of the two situations.  And that's
5  why I wanted to make sure I got something out before we
6  moved into May.  As the school year was coming to a close, I
7  wanted to -- I wanted to be pretty adamant about the
8  videoing component of this.
9    Q.  What do you recall -- so, you recall an
10 elementary school issue and a middle school issue.  I don't
11 want you to give me any student names.  But tell me what you
12 recall about each of those issues.  Let's start with the
13 elementary school issue.
14   A.  I was never provided a name or a specific
15 situation with either videoing incident.  Elementary, I had
16 no name.  Secondary at junior high, I had no name.  Cheri
17 just let me know that, "Hey, we have got a couple of issues
18 that are being raised about videoing.  It is my
19 understanding, Wes, that we don't video students."
20          Because we have parents actually sign a document
21 on our website to have their photos used in any of our
22 publications.  We have talked about this before about
23 videoing.  And Cheri is letting me know, because she thinks
24 that I may need to put something out to reemphasize it.
25          That was the extent of the conversation as far as



| Reiter v. TCA | WESLEY RAY JOLLY | March 16, 2021 |

**113**
1  Q.   And that is different from the normal public
2  school renewal window, right, where renewals are made in
3  March?
4       MS. JAY:  Objection.  Foundation.  You can
5  answer.
6  A.   The -- I am not familiar with the typical public
7  school entity on how they do renewals.  Their personnel
8  processes are different than ours.  But we typically align
9  those with our evaluation, our P&C, so we can let our staff
10 know what we will be paying them for the next year.
11      Now, if a staff member is -- we know is not going
12 to be renewed prior to a certain time frame, you could --
13 they could be -- that could be known earlier, but in this
14 situation, the events of April 23rd and 24th predicated this
15 action.  So, combined with the other.  So, it worked within
16 the normal time frame of when we would be considering
17 renewals.
18 Q.   I am going to ask you to look at the response to
19 Interrogatory No. 1 in this case.  So, I will share that.  I
20 will make this -- I will make that more manageable.
21      MR. KALMANOWITZ:  We will make these discovery
22 responses Exhibit 16.
23      (Deposition Exhibit 16 was marked.)
24 A.   That appears to be readable as is.
25 Q.   Great.  I am not going to touch it.  What I am

**114**
1  going to do is I am going to scroll down, because the
2  interrogatory is the question.  "Why was Ms. Reiter's
3  contract not renewed?  Please identify every reason for the
4  decision not to renew her account."
5       The response starts out with an objection from
6  your counsel.  I am not going to ask you to weigh in on
7  that, unless you want to talk to me about the In Re:
8  Convergent Technologies Securities litigation case.
9       So, "Without waiving any objection" -- we will --
10 we have the ability, I think, to start here -- "Ms. Reiter
11 was not asked to return for numerous reasons, including the
12 following."  And we have this list.  And it goes down.  And
13 you assisted in the preparation of these interrogatory
14 responses, correct, Mr. Jolly?
15 A.   That is correct.
16 Q.   And you remember signing off on them?
17 A.   That is correct.
18 Q.   So -- I didn't know it was going to do that when
19 I underlined it.  Let me make that go away.
20      This list, I mean, this is the same list we have
21 been talking about throughout the course of the deposition.
22 It is what is in your notes.  You know, what I want to ask
23 you is what was the straw that broke the camel's back here?
24      Was there one thing on this list that was what
25 made you just say, "Do you know what, that is it, enough is

**115**
1  enough, I have got to pull the trigger and get rid of
2  Ms. Reiter"?
3  A.   It was a culmination of all of those items.
4  Q.   So, if any one of these things is removed from
5  this list, Ms. Reiter would not have been terminated or not
6  renewed?
7  A.   That wasn't my statement.  I am saying it is a
8  culmination of these.  For me, when you look at a
9  culmination, if you removed one, the preponderance of the
10 other ones would weigh in a manner that the same decision
11 would be made.
12 Q.   So, it is every one of these things put together?
13 There is not one thing here that is the straw that broke the
14 camel's back?
15 A.   I was asked to provide my reasons for the
16 nonrenewal of Sarah Reiter.  And all of these items played
17 collectively in that decision, including the continual lack
18 of understanding and attempt to understand TCA's philosophy
19 and why we did things, and the continual use of the same
20 terminology to describe what we are doing as a group of
21 professionals to educate students culminated in her
22 nonrenewal.
23 Q.   So, I guess what I am getting at, is it all she
24 did was not -- not express positive things about TCA, and
25 none of the other things happened, would she have been

**116**
1  nonrenewed?
2       MS. JAY:  Object to form.  You can answer.
3  A.   State that again.  I think I missed the first
4  part of it.
5  Q.   If the only thing on this list that had occurred
6  was that Ms. Reiter rarely expressed anything positive about
7  TCA, would that have resulted in her nonrenewal?
8  A.   If she didn't -- if that is the only item, she
9  didn't say positive things about TCA, as a stand-alone, I
10 would probably say no, because I don't expect everyone to
11 say positive things all the time.  I get constructive
12 feedback of my -- of different things that happen at the
13 school.
14      So, as a stand-alone, obviously I don't believe
15 that would lead to nonrenewal, but when you put that into
16 consideration with I don't know how many other items are
17 listed there, they have -- they have a certain synergy to
18 them I would classify.
19 Q.   Do any of these items on this list, standing
20 alone, justify the decision to not renew?
21 A.   I would have to look through the entire list
22 again.
23 Q.   We can do that.  I am not going to deprive you of
24 the opportunity to do that.
25 A.   I can't read it now.  It shifted a little bit



WESLEY RAY JOLLY

Reiter v. TCA

March 16, 2021

**117**

1  again.  But I do -- there is a copy available of this that I
2  am not referencing that I have a printout of this.  Can I
3  refer to that?
4       Q.   Let me do this instead.  I can do this for you
5  and make it even easier.  I will put it in the chat, and
6  then you can open it directly from the chat.  That way you
7  don't --
8            MR. KALMANOWITZ:  Does that work for everybody?
9            MS. JAY:  That works.
10           MR. KALMANOWITZ:  So, that is in the chat,
11 Mr. Jolly.  Let me know if you are able to open it.
12           THE WITNESS:  I don't see anything in my chat.
13           MR. KALMANOWITZ:  It is my problem.  Anica sent
14 me a direct message earlier.  I am not good at Zoom.  I
15 responded to her direct message.  So, only Anica can open
16 it.  And it is Anica the law student, not Anica my client,
17 because I really am not good at this.  My apologies.
18 BY MR. KALMANOWITZ:
19      Q.   Are you able to get that open, Mr. Jolly?
20      A.   It is opening.
21      Q.   Great.
22      A.   First it had to download.  That is page 3?
23      Q.   It starts on page 4.
24      A.   Okay.
25      Q.   And runs through to the top of page 6.  I believe

**118**

1  the question was, is there anything on this list that,
2  standing alone, would merit nonrenewal?
3       A.   Again, I believe that many of these collectively
4  as I summarize in some of the areas alone would be grounds
5  for nonrenewal.  And I have to look at them in that
6  collective view.  Obviously, if someone doesn't express
7  positive things about TCA, that alone would not be an item
8  that would not lead to renewal.
9            But someone who disparages the outgoing
10 principal, has unprofessional outbursts, was in such
11 disagreement over philosophical approach of the school,
12 demonstrated inability to work effectively within the team.
13 All -- many of those could and potentially would lead to
14 nonrenewal.  That's why when this question was posed, I
15 needed to show the continuum of the things that were in my
16 mind in why I made this decision.
17      Q.   Who told you that Ms. Reiter disparaged Don Stump
18 by referring to him as "little old man"?
19      A.   Jody Peterson told me that.
20      Q.   When did she tell you that?
21      A.   She told me that in our conversations of
22 April 24th to 26th.  It was in those conversations during
23 that time frame that she mentioned that, that that occurred
24 at a meeting at the district and raised some eyebrows, and
25 that several people in the room heard the comment.

**119**

1       Q.   Did she tell you anybody else was present at the
2  meeting?
3       A.   Did -- state the question again.
4       Q.   Did she tell you who anyone else was that was
5  present at the meeting?
6       A.   I do not recall specifically.  I think it was a
7  meeting where there were other potential assistant
8  principals, but I -- I am not sure of who was at that
9  meeting, but it was a district meeting either for testing or
10 some assistant principal discussions.
11      Q.   If Ms. Peterson had not met with you on the 24th
12 and shared the information that she shared with you about
13 her interaction with Ms. Reiter that day, would Ms. Reiter
14 have been renewed for the upcoming school year?
15           MS. JAY:  Object to form.  You can answer.
16      A.   There were questions raised about Mrs. Reiter's
17 performance going back to the beginning of the school year,
18 continuing through the testing fiasco and blaming the
19 teachers, that were leading to conversations about her
20 future at TCA.  The actions that took place on April 23rd
21 and 24th were the things that made it in my mind the
22 decision needed to be made, and this was not recoverable.
23      Q.   Who was having those conversations about whether
24 Ms. Reiter would be renewed before you had this meeting on
25 the 24th with Ms. Peterson?

**120**

1       A.   The -- those are my -- my thoughts in my
2  discussions that I said were ongoing with Don Stump about
3  how she was progressing, how she was understanding our
4  philosophy, the elementary leadership team, where those
5  conversations continued to happen throughout the year.
6            So, it was just -- there was a -- there was a
7  list of items that you start having from a staff member
8  going, is this -- is this person someone who is going to
9  continue at TCA and understands what our approach is?  And
10 it was apparent, as I put in my comments, that Sarah Reiter
11 was not at that position at that point.
12      Q.   In meetings that you were having with Don Stump
13 before April 24th, were you suggesting to him that
14 Ms. Reiter be not renewed for the upcoming school year?
15      A.   I don't recall having a specific conversation
16 about nonrenewal, because many of the conversations I was
17 having with Don Stump was about when he was going to make
18 his decision whether he was going to retire or not.  So,
19 there was a lot of discussions going on at that time about
20 who -- what the -- what the future looked like for North
21 Elementary.  So, the conversations were multifaceted.
22      Q.   When you used the word "conversation," are you
23 referring to a verbal communication where there is back and
24 forth between more than one individual?
25      A.   When I am -- when I am referring to



Pelton Reporting Service, Inc.   (719) 578-2062
www.peltonreporting.com