1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF COLORADO

3    Civil Action No. 1:20-cv-1150-RBJ
     _____
4
     VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION OF:
5    SARAH REITER - MARCH 18, 2021
     _____
6
     SARAH REITER,
7
     Plaintiff,
8
     v.
9
     THE CLASSICAL ACADEMY, A COLORADO CHARTER SCHOOL,
10
     Defendant.
11   _____

12

13          PURSUANT TO NOTICE AND AGREEMENT, the

14   video-recorded deposition of SARAH REITER was taken via

15   videoconferencing per stipulation of all parties on

16   behalf of the Defendant, on March 18, 2021, at

17   9:31 a.m., before Suzanne Reid, Registered Professional

18   Reporter, Certified Shorthand Reporter, and Notary

19   Public within Colorado.

20

21

22

23

24

25    Job No. 736136

**EXHIBIT**

**D**

SARAH REITER - 03/18/2021

Page 18

1  were coming in very quickly.  So it was more about the
2  eminent components of leading a school, schedules.
3           There was a lot of construction going on,
4  massive amount.  They were building two large additions
5  to the campus, so there was a lot of updates with that
6  because, you know, things with construction change.  So
7  there was training on that and -- and meeting about how
8  we were going to do -- redo -- do things different.  I
9  only knew it this way, but other people knew it other
10 ways.  So we were communicating on that and training
11 ourselves on the new process of that.
12          Cheri Birkey, I -- Don and -- and the
13 assistant principals said to use as a resource, so I
14 would call her or -- or meet with her to go over --
15 just to make sure we were compliant with different
16 policies.  But -- and in -- I would call that question
17 informal training, yes.  She would explain the
18 policies.  Because there's District 20 policies and
19 then there's what they called the DAS policy, director
20 of academic service policy, as I understand.  And she
21 would explain those to me when I would have questions,
22 if you consider that informal training.
23      **Q.   Sure.  Any other informal training that you**
24 **can think of as you sit here today?**
25      A.   I -- I can't recall any more at this time,

Page 19

1  no.
2      **Q.   Towards the beginning of the 2017-2018 school**
3  **year with TCA, do you recall having any issues or any**
4  **issues arising related to the fifth-grade teachers?**
5      A.   Yes.
6      **Q.   What do you recall about that?**
7      A.   I recall we were meeting.  It was like a
8  grade-level meeting, and there was a change in the
9  assessment of reading that year for the grades.  If
10 students in the previous spring were at benchmark, we
11 were no longer testing everybody again in the fall in
12 August.  And that was a change.  Usually we would
13 screen everyone again to see the changes over summer.
14 But I -- I guess, the -- that was -- happened before
15 me.  So the change was that we were not going to be
16 screening kids who were above benchmark.  So there was
17 discussion.  And we had two new team members teaching
18 fifth grade.  So there was discussion on how are they
19 going to know.
20          There was these blue folders that teachers in
21 the past would collect data from.  And I understand, it
22 was before I was there, it wasn't always completed for
23 each classroom.  So the data wasn't accurate, or there
24 were missing pieces when they were supposed to have
25 been turned in last spring.

Page 20

1           So we were discussing -- the teachers
2  wanted -- as I remember, they were talking about how
3  are they going to get this data if they're not
4  screening kids with DIBELS, which is an acronym,
5  D-I-B-E-L-S.  I don't remember what it stands for.  But
6  it's now called something else.  But it was what we
7  used as a universal screener.
8           And I don't remember the specifics.  I do
9  know it -- I could have -- I could have been better as
10 far as I was probably too direct.  I don't remember
11 what exactly was -- it was entailing, the specific
12 details.  But it was something around they didn't have
13 time to screen kids another way or they didn't have
14 time to develop all the interventions they were going
15 to need or how are they going -- as much as I remember.
16 And I remember saying, Well, that's not our choice, we
17 have to do that.
18      **Q.   Don Stump was your direct supervisor while**
19 **you were at TCA; correct?**
20      A.   Yes.
21      **Q.   Who else did you consider to be one of your**
22 **supervisors at TCA?**
23      A.   Well, I was confused because the director of
24 instructional philosophy was acting like a supervisor.
25 And I wasn't sure.  So I asked Don, and Don said he was

Page 21

1  mine.  And I was trying to understand that.  But I only
2  thought of Don as my supervisor.  But Dorothy Simpson,
3  as the dean of philosophy, acted like she was my
4  supervisor.
5      **Q.   So I -- I think you -- I think you referred**
6  **to Dorothy Simpson as director of instructional**
7  **philosophy or dean of --**
8      A.   I believe her title was -- yeah, it probably
9  was dean, actually.  You're right.
10     **Q.   And that's fine.  I just -- so that when we**
11 **look at this later, we know that we're talking about**
12 **Dorothy Simpson in that role; correct?**
13     A.   Yes.
14     **Q.   Okay.  So Don was your supervisor.  You felt**
15 **that Ms. Simpson was acting like your supervisor.  Did**
16 **you have any other supervisors while you were at TCA?**
17     A.   Can you define supervisor?
18     **Q.   Well, you know, you -- I -- I'm kind of**
19 **taking your lead on -- on defining it.  And -- and**
20 **you've -- you've told me who you understand was**
21 **actually your supervisor, being Mr. Stump, Don Stump,**
22 **and then who was acting like your supervisor, meaning**
23 **Dorothy Simpson.  Was there anyone else who you felt**
24 **was acting like your supervisor?**
25     A.   I -- I believe Jennifer Walker, one of the

SARAH REITER - 03/18/2021

1    A.    Maybe -- you -- you cut out.

2    Q.    Sorry.  Using intervention plans?

3    A.    Yeah, a variety, uh-huh.  Whether it's the --

4    yeah, like you said, 504, English language plan, READ

5    plan, individual education plan.  We have a lot of

6    plans in education.

7    Q.    Yes.  I -- I've learned that.

8          And so are you -- is it your understanding

9    that they are raising questions about whether SPIRE

10   was conflicting or in line with Spalding, not the

11   Spalding intervention piece but Spalding?

12   A.    Right.  Right.  They just wanted to make sure

13   it wasn't too off of Spalding's ways.

14   Q.    Right.

15   A.    Or phonic line or the way they teach it,

16   yeah.

17   Q.    Right.  And -- and you just -- you told me

18   earlier that making sure that the intervention piece,

19   regardless of what type of program we're talking about,

20   whether we're talking about reading or math, that that

21   intervention piece meshes or coincides with the bigger

22   plan, Spalding in this case, since that's what we're

23   talking about that.  That's important because you need

24   some cohesiveness?

25   A.    Correct.

1    Q.    Okay.  So other than concerns about potential

2    cohesiveness issues between SPIRE and Spalding, were

3    there other concerns that Dorothy or anyone else at TCA

4    was raising with you about SPIRE?

5    A.    No.

6    Q.    Okay.

7    A.    I don't believe so.

8          MS. JAY:  So I'm getting ready to change the

9    subject, so I'm just going to take a -- does anyone

10   need a quick break?

11         MR. KALMANOWITZ:  Let's just take a quick

12   five-minute rest break.

13         THE REPORTER:  We are going off the record.

14   The time is 12:52.

15         (Recess taken from 12:52 p.m. to 12:57 p.m.)

16         THE REPORTER:  We are back on the record at

17   12:57 p.m.

18   Q.    (BY MS. JAY)  So I said I was going to change

19   subjects, but I actually have one more questions for

20   you about your conversation with Jody Peterson.  And

21   this is the April conversation with Jody.

22         During that conversation, did you tell

23   Ms. Peterson that you were looking for another job?

24   A.    No.

25   Q.    Were you looking for another job at that

1    point?

2    A.    I had had a few interviews during the time

3    that we were -- maybe -- maybe two interviews that --

4    in the time between, like I said, Jody was announced as

5    principal on that day in the car, the day before.  So I

6    didn't know who my principal was going to be.  And so

7    sometimes when you're inherited it's different than

8    when they've hired you.

9    Q.    The interviews that you had had prior to your

10   conversation with Jody in the car in April, were

11   those -- just tell me what those interviews were for.

12   What positions?

13   A.    Assistant principal.

14   Q.    Two or three interviews is -- is what you

15   recall?

16   A.    No.  One, maybe two.  I can't remember for

17   sure the dates.

18   Q.    Did you receive job offers from -- I want to

19   say from either -- from any of those interviews?

20   A.    No.

21   Q.    When you learned that Jody Peterson was going

22   to be your principal, did you have a desire to work

23   with Jody going forward into the next school year?

24   A.    Yes.  I like Jody very much.

25   Q.    Did you tell Jody though that you could not

1    commit to three years or however long it may take to

2    move North forward in the direction that Jody

3    envisioned for North?

4    A.    When she asked me for a three-year

5    commitment, because it was going to take that long to

6    turn a school that Don Trump -- Don Stump had been

7    leading would be at least three years, I -- I responded

8    that I wasn't sure.

9    Q.    All right.  Now I really am going to move to

10   another topic.

11   A.    Okay.

12   Q.    This is the -- the April meeting with Wes

13   Jolly where you talked -- well, where he told you that

14   you would not be renewed for the following school year.

15   So that's the meeting I want to talk about now.

16   A.    Okay.

17   Q.    I'm going to do the same thing where I want

18   to have you tell me what you recall sitting here

19   without any documents in front of you about the

20   conversations that you had during that meeting.

21   A.    I walked in.  He informed me that he was

22   nonrenewing me.  I recall him asking me if I knew why.

23   I didn't know why.  I said no.  And he proceeded to

24   look at an e-mail that Jody sent him and read off all

25   these alleged things that she accused me of saying.

SARAH REITER - 03/18/2021

Page 110

1    A.   I don't remember how he responded.  I don't
2  know if he even gave a verbal response.
3    Q.   Okay.
4    A.   Sometimes when he's listening, he -- he nods
5  and, you know, goes like this (indicating).  I can't
6  remember exactly how it went.
7    Q.   Okay.  So I'm marking this as Exhibit
8  Number 24.
9         (Deposition Exhibit 24 was marked.)
10   Q.   (BY MS. JAY)  For the record, it's Reiter
11  000233 through 235.  Let me scroll down so you can even
12  see what this is.  And this again is something we
13  received as a disclosure from you.  You -- you direct
14  me on scrolling because I can scroll as fast or as slow
15  as you want.
16        My question is going to be, do you recognize
17  this document?
18   A.   Well, it doesn't look like a document.  It
19  looks like a website.
20   Q.   Okay.  Do you recognize it?
21   A.   Can you scroll up?
22   Q.   Yes.
23   A.   (Deponent perused document.)
24        And then scroll down.
25   Q.   Yes.

Page 111

1    A.   Is this the internal -- like I don't know,
2  Internet, you know what I mean, like --
3    Q.   Let me ask it this way.  Do you recall
4  pulling this from TCA's website?
5    A.   No, I don't recall it.
6    Q.   Did you ever --
7    A.   The only --
8    Q.   Sorry.  Go ahead.
9    A.   The only thing I can think of is we had a
10  parent who was filing a grievance.  She was upset that
11  her child was put on a safety plan.  So I'm wondering
12  if I looked it up to see what it -- the process was.
13  And that was around April I think as well.
14   Q.   And did you ever fill out this online form
15  for any reason?
16   A.   No, not to my knowledge.
17   Q.   Okay.  Ms. Reiter, this was previously marked
18  as Exhibit Number 18 in one of our earlier depositions.
19        Do you recognize this document?
20   A.   Yes.
21   Q.   What is this?
22   A.   Letter of recommendation from --
23  recommendation from Don Stump.
24   Q.   And it's dated March 23rd, 2018?
25   A.   Yes.

Page 112

1    Q.   Did you receive it on or around March 23rd of
2  2018 from Mr. Stump?
3    A.   I believe so, if that's what it's dated.
4    Q.   Did you tell Mr. Stump that you were looking
5  for another job?
6    A.   I like to get letters from my principals who
7  actually, you know, my work day to day.  And
8  because I think at that time he had already announced
9  his retirement, so I wanted to have that.  And we had
10  discussed if he knew any of the candidates that were
11  coming in and, you know, what their styles were and,
12  you know, I didn't know who that was going to be.  So I
13  said I wanted to apply for this one AP position, and I
14  asked him for that.
15   Q.   And so would this have been then in
16  connection with the one or two interviews that you
17  talked about earlier for an AP position?
18   A.   Yes.
19   Q.   So I'm going to mark this document as
20  Deposition Exhibit 23.  Just for the record, it is
21  Bates label TCA 000387.
22        MR. KALMANOWITZ:  Lindsey, did you say 23?
23        THE REPORTER:  It's 25.
24        MR. KALMANOWITZ:  We're up to 25.
25        MS. JAY:  Are we all the way to 25 now?

Page 113

1  Okay.
2        MR. KALMANOWITZ:  Yeah.
3        MS. JAY:  Apologies.  Exhibit 25.  Going back
4  to Exhibit 18 threw me off.
5        (Deposition Exhibit 25 was marked.)
6    Q.   (BY MS. JAY)  I'm going to assume, because
7  you are not copied on this, that you never -- you
8  didn't receive this document at the time?
9    A.   No, I didn't.
10   Q.   Okay.  This document is dated Monday,
11  April 9th, 2018, and it is from Bridget Kingsford to
12  Wes Jolly.  And feel free to take your time to read
13  this.  I'm looking at the -- it's right in the middle.
14  It's the second full sentence.  "There is a sub (Reagan
15  Ward) from the District filling in because Sarah has a
16  job interview."
17        Do you see that?
18   A.   I do.
19   Q.   Did you have a job interview on that date?
20   A.   I can't remember the exact date.
21   Q.   Were you unable to attend testing at your
22  school because of a job interview?
23   A.   No.  Testing is many sessions.  You -- you do
24  the calendar in advance and submit it to the Colorado
25  Department of Education.  What was the question?

SARAH REITER - 03/18/2021

Page 114

1    Q.    Did you miss any testing at North because of
2  a job interview?
3    A.    Yes.
4    Q.    Okay.  So this document, I've marked
5  Exhibit 26.
6          (Deposition Exhibit 26 was marked.)
7    Q.    (BY MS. JAY)  For the record, it is Reiter
8  000255 through 256.  This is one of those documents
9  that was produced to us unredacted, and I have redacted
10  out the student's last name.  You can see that on the
11  screen.  Just so that -- full disclosure.  That's my
12  redaction on there.
13          First of all, let me ask you this.  Looking
14  up here where it was forwarded, it looks like you
15  forwarded it from your TCA e-mail address to your
16  personal address on May 11th, 2018.
17          Do you see that?
18    A.    Yes.
19    Q.    Why did you forward this e-mail to yourself
20  on May 11th, 2018?
21    A.    I wasn't sure if my -- if I was going to have
22  access to my e-mails.  Like I didn't know how that
23  worked when you're nonrenewed, if it just goes away.
24  So I wanted to have this.
25    Q.    Why did you want to have this?

Page 115

1    A.    I don't know.  I -- I guess to remember.
2    Q.    Let me scroll this so you can see what you
3  actually wrote.  What -- what about this did you want
4  to remember or need to remember?
5    A.    The parts about the disconnection in her
6  brain.
7    Q.    Did you forward this e-mail to yourself
8  because you believed that you had been retaliated
9  against for advocating for Abby?
10    A.    Yes.
11    Q.    What specifically in your mind gave you a
12  reason to believe that you had been retaliated against
13  because of your advocation for Abby?
14    A.    There were several children I advocated for.
15    Q.    And I'm asking about Abby.
16    A.    And what was the question?
17    Q.    What made you think that anything that you
18  did on behalf of Abby, that you were retaliated against
19  for?
20    A.    I was concerned that I was nonrenewed because
21  I was -- for the reasons that Wes explained.  And I
22  wasn't completely clear about all the policies or
23  whatnot that he was alleging or Jody said for him to
24  allege in her e-mail.  And then when I asked Don, Am I
25  still supposed to continue to do safety plans,

Page 116

1  discipline, teacher evaluations, and he said, Yes, I --
2  I just wanted to -- I didn't -- I was not very
3  trustful, and I wanted to make sure that I wasn't --
4  you know.
5    Q.    Did anyone at TCA ever tell that you had done
6  anything wrong with respect to questions or concerns
7  that you raised related to Abby?
8    A.    No one ever told me I did anything wrong and
9  I was nonrenewed, so I didn't know what to think.
10    Q.    So other than the mere fact of nonrenewal, do
11  you have any reason to believe that you were nonrenewed
12  because of your advocation for Abby?
13    A.    Can you rephrase that.
14    Q.    Sure.
15    A.    Or explain it.
16    Q.    I'll try.  I'll try.  Other than the fact
17  that you were nonrenewed, what other evidence are you
18  aware of that would indicate that you were not renewed
19  because of the fact that you were advocating for Abby
20  and others?
21    A.    When I talked with the tutors that -- the
22  teacher assistants who made her clean the cafeteria
23  floor and asked them not to discipline her anymore, I
24  think that they might have a little offended.  And we
25  had a -- a regroup of the team, Abby's team with the

Page 117

1  nurse and Mr. Sutton, the psych, and myself, Mr. Stump,
2  I can't remember everybody who was in it, to reconsider
3  some things that we were doing because her condition
4  was changing.
5          And this was going on after the nonrenewal,
6  so I just -- I didn't -- I didn't know what to think.
7  I didn't -- everybody -- it just -- the whole asking to
8  videotape and then asking them not to make a child that
9  has an IEP and a 504 sweep the cafeteria floor as
10  punishment for -- I don't even remember what it was at
11  the time.  I was -- you know, I -- I just wasn't sure
12  if I was going to be set up again in some other
13  fashion.
14    Q.    You think you were set up?
15    A.    I don't know what else to think it was.
16    Q.    Who do you think set you up?
17    A.    Dorothy Peterson [sic], to take the video,
18  and Jody Peterson, in -- in sharing inaccurate and
19  untruthful information to Wes.
20    Q.    No one allowed Dorothy to take a video of any
21  child; right?
22    A.    I have no idea.  I just know she asked me to
23  do it, and I said no and I was --
24    Q.    So everyone including Wes Jolly said it is
25  inappropriate to videotape a student that you're aware

SARAH REITER - 03/18/2021

Page 118

1  of; correct?
2      A.    Correct.
3      Q.    Going back to Abby, because that's really
4  what I'm asking you about now, because those are some
5  of the specific allegations you have in your complaint.
6  With respect to -- and let me -- I guess I should
7  clarify.  The Abby in this Exhibit Number 26, is that
8  the same individual as AK that's referenced in your
9  complaint?
10     A.    Yes.
11     Q.    Okay.  I just want to make sure we were clear
12 on that because I've I seen a reference to an Abigail
13 in e-mails and I don't necessarily think it's the same
14 person, so -- regardless.
15           Okay.  So you mentioned with Abby in
16 particular, that you raised concerns about some of the
17 forms of discipline.  I think you mentioned the -- the
18 cafeteria issue, right, and the teachers were offended?
19     A.    What do you mean the cafeteria and the
20 teachers were offended?  I --
21     Q.    So you told me earlier when I asked you about
22 what was it about issues and concerns that you raised
23 about Abby that you believe led to you being
24 nonrenewed, and you mentioned to me that when you
25 raised the concerns, there were teachers that were

Page 119

1  offended by it.  And then you had a regroup.  Did I
2  mishear you?
3      A.    Yes.  The teacher assistants called tutors
4  seem offended.
5      Q.    Okay.
6      A.    Because I -- because of their lack of
7  understanding, the disability that Abby has, they
8  thought it -- she was just being defiant when it really
9  was that she was not accessing that part of her brain.
10     Q.    And then there was a regroup as a result of
11 that; right?
12     A.    Yes.
13     Q.    Okay.  And in that regroup, was it agreed
14 upon that the type of discipline that she was receiving
15 shouldn't continue, that there should be a different
16 approach taken with her?
17     A.    Yes.
18     Q.    Did anyone in that regroup express to you
19 that they thought your raising concerns about the
20 discipline that Abby was receiving was inappropriate?
21     A.    Was what?
22     Q.    That your raising concerns was inappropriate?
23     A.    No, I don't believe so.
24     Q.    And do you have any understanding or
25 knowledge that the tutors that you felt were offended

Page 120

1  had any decision-making authority as to your
2  nonrenewal?
3      A.    They could have.  I don't know that.
4      Q.    Do you have any actual knowledge that they
5  had any decision-making authority with respect to your
6  nonrenewal?
7      A.    Do I have any knowledge?
8      Q.    Correct.
9      A.    No.
10     Q.    You --
11     A.    You know, you mentioned something a few
12 minutes ago.  Can we have the court reporter say it
13 back?  It was something about I had no knowledge of
14 Dorothy videoing or something like that.
15     Q.    Yeah.  Did you -- did you need a chance to
16 clarify (audio distortion)?
17     A.    Yeah, I just wanted to hear it again, the
18 question and --
19     Q.    If the -- if the reporter knows what you're
20 talking about, I'm fine with having her read that
21 dialogue back.
22           THE REPORTER:  We'll have to go off the
23 record for that because I can't be on the record and
24 look for it at the same time.
25           So we're going off the record at 2:12 p.m.

Page 121

1            (Recess taken from 2:12 p.m. to 2:19 p.m.)
2            THE REPORTER:  We are back on the record at
3  2:19 p.m.
4            (BY MS. JAY)  So we went off the record,
5  Ms. Reiter, because there was a question and response
6  that you believed you needed to clarify.
7      A.    Yes.
8      Q.    What was that?
9      A.    The -- the question that the court reporter
10 read back about -- now I forgot it again.  The one
11 with -- can you read it again, Suzanne.  I'm sorry.
12           THE REPORTER:  One moment.  Nobody say
13 anything.
14           No one allowed Dorothy to take a video of a
15 child; right?
16           And your response was, I have no idea.  I
17 know she asked me to do it and I said no.
18           Then there was a follow-up question:  So
19 everyone, including Wes Jolly, said it was
20 inappropriate to videotape a student that you are aware
21 of; correct?
22           And your answer was, Correct.
23           THE DEPONENT:  What was the next one after
24 that?
25           THE REPORTER:  Going back to Abby.  That's