**Page 1**

```
            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO

            Civil Action No. 20-CV-1150-RBJ
_____
Plaintiff(s):
SARAH REITER
vs.
Defendant(s):
THE CLASSICAL ACADEMY, a Colorado Charter School
_____

Scheduling Attorney for the Plaintiff Via Zoom:
MR. IAN D. KALMANOWITZ, ESQ.
Cornish & Dell'Olio, P.C.
431 North Cascade Avenue, Suite 1
Colorado Springs, CO  80903
(719) 475-1204
Atty. Reg. No. 32379
ikalmanowitz@cornishanddellolio.com
**Appearances continued on page 2**
      _____
           ZOOM DEPOSITION OF JODEAN ESTHER PETERSON
                Reported Remotely Pursuant to the
         Colorado Governor Issued Executive Order D 2020 019
                              and
                   Colorado Secretary of State
            Notary Rules 8 CCR 1505-11, Section 1, Rule 5
                        March 16, 2021
```

**Page 2**

```
 1  APPEARANCES CONTINUED:
 2  For the Defendant Via Zoom:
    MS. LINDSEY W. JAY, ESQ.
 3  Overturf McGath & Hull, P.C.
    625 East 16th Street
 4  Denver, CO  80203
    (303) 860-2848
 5  lwj@omhlaw.com
 6
    Also Present Via Zoom:
 7
    Anica Midthun, with Cornish & Dell'Olio
 8  Sarah Reiter
 9  PURSUANT TO NOTICE, the Zoom deposition of JODEAN ESTHER
10  PETERSON was taken on behalf of the Plaintiff, pursuant to
11  the Colorado Rules of Civil Procedure, taken at the location
12  of the deponent in Colorado Springs, Colorado, at 9:36 a.m.,
13  remotely before Sandi K. Pelton, RPR, RMR, CRR.
```

**Page 3**

```
 1                      I N D E X
 2
 3  DEPOSITION WITNESS:                            PAGE
 4  JODEAN ESTHER PETERSON
 5  Examination By Mr. Kalmanowitz:                  5
 6
 7  DEPOSITION EXHIBITS MARKED:
 8   NO.   DESCRIPTION                             PAGE
 9    1   The Classical Academy Employee            26
          Handbook
10
      2   1/22/18 Email String from TCA             54
11        Jodean Peterson to TCA Wesley Jolly
12    3   Text Messages - Bates TCA 000115          59
13    4   4/25/2018 Email String from TCA           65
          Jodean Peterson to TCA Wesley Jolly
```

**Page 4**

```
 1          WHEREUPON, the following proceedings were had:
 2
 3                  JODEAN ESTHER PETERSON,
 4  the deponent herein, having been first duly sworn to state
 5  the whole truth, testified on the oath as follows:
 6
 7          MR. KALMANOWITZ:  Good morning.  I guess I want
 8  to start before I start asking any questions, I am going to
 9  ask the court reporter to record the video of the deposition
10  today.  And I know that before she agrees to do that, I have
11  to get everybody's agreement that they are okay with us
12  recording the video.
13          So, first, Lindsey, are you okay with the court
14  reporter recording the video?
15          MS. JAY:  We agree.  Yes.
16          MR. KALMANOWITZ:  Ms. Peterson, is that okay with
17  you?
18          THE WITNESS:  Yes.
19          MR. KALMANOWITZ:  So, one of the things we will
20  have to do is make sure that you are responsible for muting
21  your mic whenever we go off the record.  In the event that
22  you and counsel want to have a conversation about something
23  and you are not together and you don't mute your mic, we
24  might be able to hear it.  So, I will try to remind
25  everybody before we go off the record, but let's just keep
```



JODEAN ESTHER PETERSON

Reiter v. TCA                                                                 March 16, 2021

```
                                              49
 1  things that were -- that she was not -- that seemed to be a
 2  result of his medical issues from her observation, yes.
 3       Q.  Did you and Ms. Kingsford or did you or
 4  Ms. Kingsford escalate that information to anyone?
 5       A.  Yes.
 6       Q.  Who did you bring that information to?
 7       A.  My principal.
 8       Q.  And what did you tell your principal about
 9  Ms. Reiter's situation at North?
10       A.  That she -- that things were -- that she didn't
11  feel the support from her principal.
12       Q.  Do you know -- and your principal at the time was
13  Ms. DeMeyer?
14       A.  Yes.
15       Q.  What did Ms. DeMeyer say when you brought that
16  information to her?
17       A.  I believe she took it to Wes Jolly.
18       Q.  Okay.  Did she make any suggestions for you to
19  offer to Sarah?
20       A.  Not that I can recall.
21       Q.  Other than the conversations we talked about
22  surrounding RtI, do you recall having any other discussions
23  with Ms. Reiter about students with disabilities?
24       A.  No, I don't.
25       Q.  Did you and Ms. Reiter ever have any discussions
```

```
                                              50
 1  about TCA's ability to provide services for students with
 2  disabilities?
 3       A.  No.  I don't remember that.
 4       Q.  Do you remember having any discussions with
 5  Ms. Reiter where she expressed concerns about teachers or
 6  staff having adequate training to help advance students with
 7  disabilities?
 8       A.  I recall her expressing concern over teachers who
 9  were not certified, that were just highly qualified, that
10  did not have the teaching degrees to meet the students'
11  needs.
12       Q.  So, Ms. Reiter discussed with you the fact that
13  TCA employed uncertified or noncertified teachers, and her
14  concern was that those teachers who didn't have
15  certifications didn't have what she believed to be an
16  appropriate level of training to provide services to
17  students with disabilities?
18       A.  She didn't specifically say students with
19  disabilities.  She referred to -- referenced children to
20  meet the needs of students.  That teachers were not
21  certified to meet the needs of students.  They were neither
22  trained enough -- and for struggling students.  And that
23  doesn't mean that that is a student who is served by student
24  support services.
25       Q.  Okay.  Do you recall Ms. Reiter expressing
```

```
                                              51
 1  concern that the teachers that don't have certifications
 2  don't have formal training in teaching students with special
 3  needs or intellectual disabilities?
 4       A.  No, I don't recall a conversation about that.
 5            MS. JAY:  Ian, can we take a restroom break?
 6            MR. KALMANOWITZ:  Yes.  I was just about to say
 7  this would be a good time to do that.  We have been going
 8  for about an hour and 15 minutes.  Is that okay with you,
 9  Ms. Peterson?
10            THE WITNESS:  Yes.  That is a good idea.
11            MR. KALMANOWITZ:  Why don't we take a 10-,
12  15-minute break.  Does that work for everybody?
13            THE WITNESS:  Yes.
14            MR. KALMANOWITZ:  We will come back and we will
15  get right back to it.  Very good.
16                 (Recess from 10:48 a.m. to 11:03 a.m.)
17  BY MR. KALMANOWITZ:
18       Q.  Ms. Peterson, I want to talk to you about a
19  meeting you had in January of 2018 with Wes Jolly.  Do you
20  remember meeting with Mr. Jolly in January of 2018 to
21  discuss Ms. Reiter?
22       A.  In January of 2018?
23       Q.  Yes.
24       A.  I would have to -- I would have -- you would have
25  to refresh my memory.
```

```
                                              52
 1       Q.  I -- I don't know if he met with you and
 2  Ms. Kingsford together, or if he met with you and
 3  Ms. Kingsford separately.  But I have been provided with
 4  notes that he took that indicate that he met with you and
 5  Ms. Kingsford to discuss issues that Ms. Reiter had raised
 6  with him about things like RtI, staff training, enough time
 7  for RtI, whole group instruction, and other -- other issues.
 8  Do you remember meeting with him?
 9       A.  Vaguely, yeah.
10       Q.  Do you remember if it was you and Ms. Kingsford
11  together, or if it was just you?
12       A.  I think it was -- I think we were separately, but
13  I -- separate.  I don't remember meeting with him and her at
14  the same time.
15       Q.  Okay.  Do you remember --
16       A.  It --
17       Q.  I'm sorry.
18       A.  It could have, yeah.  I'm sorry.  I just don't --
19  I don't recall.
20       Q.  Okay.  Do you remember if the meeting was in
21  person, or by telephone?
22       A.  I think I would have remembered if it was in
23  person.
24       Q.  Okay.  Do you have any independent recollection
25  of him talking to you about Ms. Reiter's concerns about --
```



Pelton Reporting Service, Inc.   (719) 578-2062
www.peltonreporting.com

JODEAN ESTHER PETERSON

Reiter v. TCA                                                                    March 16, 2021

### Page 57

```
 1        The struggle that we had with that piece was that
 2   it didn't -- the Advantage Math really was geared towards
 3   younger students, but although we had some kids that used
 4   those strategies in the upper grades that was very helpful.
 5        Q.   Okay.
 6        A.   So, I think the recent -- when you talk about
 7   those recent conversations, there was -- at that time there
 8   was a lot of discussion going on of how to beef up our
 9   servicing students that struggled in math.
10        Q.   So, Envisions is a form of RtI for math, correct?
11        A.   Envisions is our math -- was at that time our
12   math curriculum that we used that had a component of
13   remediation in the curriculum.
14        Q.   Okay.  Got it.  So, what Ms. Reiter's teacher
15   found was the intervention component?
16        A.   Yes.  Yep.
17        Q.   Okay.  Here is your response on page 1 of
18   Exhibit 2 to Mr. Jolly.  Does that help refresh your memory
19   at all about any of these recent discussions you were having
20   with Mr. Jolly about math RtI?
21        A.   Yes.  We were -- like I said, we were looking for
22   avenues in addition to Advantage Math to support students
23   that were struggling in math.
24        Q.   Did anything get done after January 22nd with
25   this Envisions intervention piece?
```

### Page 58

```
 1        A.   Yes.  We started incorporating it and using it.
 2   Teachers were looking at it more as a piece -- as an
 3   additional piece to their intervention.
 4        Q.   Okay.  Did you and Ms. Kingsford ever have any
 5   meetings amongst yourselves to talk about Ms. Reiter?
 6        A.   I think I recall that we -- our desire was to
 7   support her in -- in her new role.  So, I think -- I don't
 8   want to speak out of -- I don't -- I know that that was a
 9   concern of ours.
10             And, so, having -- we didn't have specific setup
11   meetings.  But there were conversations in how to best
12   support her in getting her to understand the RtI process
13   that was in -- implemented in the three different campuses.
14        Q.   After this Envisions intervention was located,
15   you said that teachers started using it more as part of the
16   math RtI, right?
17        A.   We started pulling it in our mentor program, and
18   mentor teachers were pulling it to find ways to support
19   teachers and getting them exposure to it, yes.
20        Q.   Do you know --
21        A.   But that's -- I'm sorry.
22        Q.   No.  Go ahead and finish.
23        A.   No.  So, I don't know -- I don't recall what that
24   process was.  I know that the teachers on my campus, we dug
25   into it with the support of the mentor program.
```

### Page 59

```
 1        Q.   Okay.  Do you know what happened with it at the
 2   North campus?
 3        A.   I do not.
 4        Q.   Okay.  Do you know if any of the teachers at
 5   North were using it?
 6        A.   I do not.
 7        Q.   All right.  Let's -- I want to show you
 8   Exhibit -- what we will mark as Exhibit 3.
 9             (Deposition Exhibit 3 was marked.)
10        Q.   This is a text message from you to Mr. Jolly.  It
11   looks like it might have got sent twice.  So, what I will do
12   is I will -- since the top text and the one right under it
13   are exactly the same, we can see the whole thing in one
14   screen.  Are you able to see your text and his response and
15   then your reply?
16        A.   Yes.
17        Q.   Okay.  So -- and this text message was sent on
18   April 24th at 5:11 p.m.?
19        A.   Yes.
20        Q.   Did you meet with Mr. Jolly at 5:35 p.m. that
21   night at his office?
22        A.   I did.
23        Q.   Okay.  Now, before -- so, April 24th was a
24   Tuesday.  Before meeting with Mr. Jolly on the 24th, before
25   having this conversation with Ms. Reiter on the 24th, did
```

### Page 60

```
 1   you also have a conversation with Mr. Jolly on the 23rd of
 2   April 2018 about Ms. Reiter?
 3        A.   Not that I recall.
 4        Q.   Okay.  What -- what prompted you to send this
 5   text message to Mr. Jolly at 5:11 p.m. on April 24th?
 6        A.   A conversation I had with Ms. Reiter in my car on
 7   the way back from a district assessment where we were
 8   turning in tests.
 9        Q.   Okay.  And you met with Mr. Jolly -- what time
10   were you and Ms. Reiter coming back from the district
11   office?
12        A.   Well, it was late afternoon, evening.  It was
13   shortly before I sent this text.
14        Q.   Okay.  And would it be unusual for you to be at
15   work at 5:30 at night on a -- on a Tuesday in April?
16        A.   No.  Huh-uh.
17        Q.   Okay.  Would it be unusual for Mr. Jolly to be at
18   work at 5:30 at night on a Tuesday in April?
19        A.   If I -- as I recall, this was -- there were
20   meetings in April that were going on for the beginning of
21   the school year.  So, there were meetings -- there were
22   evening meetings happening on campuses during this time
23   period.
24        Q.   What --
25        A.   It wouldn't be unusual.
```



Pelton Reporting Service, Inc.   (719) 578-2062
www.peltonreporting.com

**Page 61**

1  Q.  What kind --
2  A.  Prospective parent meetings, that type of stuff.
3  Kindergarten meetings.
4  Q.  Open houses?
5  A.  Kind of that setup, yeah.  That would be
6  something you could compare it to.
7  Q.  Okay.  So, you and Mr. Jolly met at 5:35 at his
8  office that night on the 24th?
9  A.  Around that time.  I don't know that it was
10 exactly 5:35.
11 Q.  Okay.
12 A.  I think his reply is saying he is -- he is in his
13 office right there, and that was -- I don't know.  What time
14 was that text sent?
15 Q.  Oh, let me put that back up.  I apologize.  It
16 looks like 5:11.
17 A.  So, it was -- yeah.  I -- yes.  That was -- that
18 was right after Sarah left my car.
19 Q.  Okay.  So, how long did you and Mr. Jolly spend
20 in his office on the night of April 24th?
21 A.  I don't believe it was that long, because I know
22 I had to be at one of the presentations that occurred.  And
23 I think those are typically, like, 6:00 or 6:30 that they
24 start.
25 Q.  Okay.  So, you were at one of the presentations

**Page 62**

1  on the night of the 24th?
2  A.  Yes.  After meeting with -- I'm sorry.  I
3  overspoke.
4  Q.  No.  That's okay.  We have been doing pretty good
5  most of the time so far.  I just want to make sure that --
6  the meeting -- because you had to be at a presentation that
7  started at -- let me back up.
8      Where is Mr. Jolly's office?
9  A.  It is on -- it is at North campus.
10 Q.  Okay.
11 A.  On the junior high side of the building.
12 Q.  Okay.  And your office at the time was at Central
13 campus?
14 A.  Correct.  But I was transitioning.  I would have
15 been started in the principal position in July.  And if I
16 recall correctly, I believe that evening Don Stump was in --
17 was introducing me as the upcoming principal.
18 Q.  Okay.
19 A.  So, I was part of his meeting.
20 Q.  Okay.  So, you would have had occasion to be at
21 North that night because these meetings with prospective
22 parents or these open house-type formats for the next school
23 year, it would make sense to introduce the new principal,
24 rather than the retiring principal?
25 A.  Correct.

**Page 63**

1  Q.  Okay.  And the program started, you can't
2  remember, it was either 6:00 or 6:30?
3  A.  Vaguely.  Yeah.  I am only -- I am making that
4  reference, not because I remember specifically, but those
5  are typical meet times that we start those meetings.
6  Q.  Right.  And I am only -- the only reason I am
7  asking is because if you met with Mr. Jolly at around 5:35
8  in his office, and you needed to be present at a meeting
9  that started at either 6:00 or 6:30, we can basically
10 ascertain that the meeting lasted somewhere between 20-ish
11 minutes to 50-ish minutes, because I assume you would have
12 to go from his office to the -- to the elementary school
13 side of the building, and it would take a couple of minutes
14 to get there?
15 A.  Yes.
16 Q.  And I have no idea how big that building is.  How
17 long do you think it takes to walk from Wes's office to the
18 elementary school?
19 A.  Five minutes, max.
20 Q.  Right.  So, basically, that meeting that you and
21 Mr. Jolly had on the evening of the 24th, if it started
22 about 5:35, it was either done at 5:55 or at 6:25?
23 A.  Right.
24 Q.  Okay.  Or somewhere in between?
25 A.  Yes.

**Page 64**

1  Q.  What do you remember talking with Mr. Jolly about
2  in his office that night on April 24th?
3  A.  I remember speaking to Mr. Jolly about how
4  concerned I was about working with someone who demonstrated
5  that she didn't -- couldn't support the programs at TCA.
6  Q.  And what did -- what was his response?
7  A.  He -- he was mainly in a listening mode.  I don't
8  remember him -- he asked me then at the end of our meeting
9  to just briefly send him the document, write up what my
10 concerns were that we had discussed, and send that to him in
11 writing.
12 Q.  Okay.  And did you -- when did you write up the
13 document?
14 A.  It was very shortly after that meeting.  I
15 probably -- I believe I wrote it that night.
16 Q.  That night.  Okay.  Is there any reason why you
17 waited until the next day to email it to him?
18 A.  Sometimes I like to just reread stuff that I
19 write late at night and refresh to make sure I have things
20 accurate.
21 Q.  Okay.  And you agree you wrote it that night and
22 sent it the next day at about 11:37?
23 A.  Or I wrote it the next day.  It could have been
24 the next day.  Yeah.  Either one of those.
25 Q.  Okay.  I want to -- I will put your email up, and



**Page 93**

1  Q.  All right. And do we know any data about this
2  administration, like what caused it, what happened?
3  A.  I do not personally, no.
4  Q.  Okay. The "demeanor" and "upper leadership."
5  These are fairly -- these are fairly straightforward. I
6  want to scroll back up and ask you a question about this
7  statement in here where you -- you and she were talking
8  about you taking over, and you were talking to her about the
9  change that would be coming. And that you expected there to
10 be a three-year window that it would take to really see the
11 effects of those changes. And that's something that we
12 talked about earlier. You mentioned something about a
13 three-year period of time, right?
14 A.  Yes. I -- yes. I was -- I am not locking into a
15 three years; that no change happens at a school for three
16 years. That was just my perspective of sharing with her
17 that, hey, I wanted her to join this partnership, and help
18 lead the school, and that perhaps it would take three years
19 to see change. I mean, it was really -- I wasn't locking
20 into saying --
21 Q.  Okay. Was --
22 A.  -- a time period. Go ahead.
23 Q.  Was that conversation about -- and I understand
24 what you are saying about the -- you might see change right
25 away on some things. On some things it might take longer to

**Page 94**

1  get the change.
2      Was the discussion about this three-year period,
3  did that -- was that at the beginning of the conversation in
4  the car, or was that at the end of the conversation?
5  A.  As I recall, I believe it was more towards the
6  end, but I don't -- I don't specifically remember, to be
7  honest with you.
8  Q.  Okay. And how was it that Ms. Reiter said -- I
9  want you to give me, like, an explanation of what the
10 conversation looked like when you write that she said she
11 wouldn't commit to three years.
12 A.  That was just her response, is I was trying to
13 encourage her -- it was actually my -- my intent was to
14 encourage her and to welcome her and to -- I wanted to
15 communicate to her that I would be a leader who would listen
16 to her and to value her perspective.
17     And then in that piece of -- in that conversation
18 of just trying to build that relationship with her, I was --
19 in that three years, her response was, "I am not going to
20 commit to three years." She stated she wouldn't commit to
21 three years, and that she was out looking for a job.
22 Q.  How did the conversation on April 24th between
23 you and Ms. Reiter end?
24 A.  It didn't end badly. It -- she just looked very
25 discouraged and noncommittal. I wasn't very certain that

**Page 95**

1  she really wanted to be the assistant principal at North any
2  longer.
3  Q.  Did you ask her if that was the case?
4  A.  No. I don't remember asking her if that was the
5  case.
6  Q.  Okay. Why not?
7  A.  I felt like what she was saying to me was she had
8  communicated that. The context of what she was saying was
9  that she really wasn't looking to continue to do that.
10 Q.  Okay. All right. So, after this conversation
11 ended, you texted Mr. Jolly, and met with him a few minutes
12 later, and recounted for him everything that happened,
13 right?
14 A.  Correct.
15 Q.  And you said he was more in, like, a listening
16 mode than a commenting mode when you met with him, right?
17 A.  Yes.
18 Q.  And he -- you then -- at his request you prepared
19 this email. Did Mr. Jolly ever communicate to you that he
20 had made a decision to not renew Ms. Reiter's contract for
21 the next school year?
22 A.  I believe I became aware of that when her
23 contract was not renewed.
24 Q.  So, when would you have found out that
25 Ms. Reiter's contract was not renewed?

**Page 96**

1  A.  I am trying to recall, because I don't believe I
2  saw Sarah after this conversation. I may have found out
3  before an email went out to the community announcing that
4  she would not be returning. But that would be typical that
5  they would let fellow administrators know.
6  Q.  Okay. Do you remember any specific communication
7  from Mr. Jolly informing you that Ms. Reiter wouldn't be
8  returning?
9  A.  I -- he may have emailed me about -- because I
10 would be her administrator, and I would need to start
11 that -- the idea of looking for an assistant principal --
12 Q.  Okay.
13 A.  -- to fill the position.
14 Q.  But you don't remember any specific email or
15 phone call or discussion with him about it?
16 A.  No specifics, no. There could have been. There
17 could have been an email.
18 Q.  Okay. Did Ms. Reiter ever talk to you about a
19 request that was made to her to videotape or video record a
20 student with special needs?
21 A.  I vaguely remember her saying that they had --
22 there had been -- I don't know -- I can't recall if it was a
23 request for somebody to do it, or if they had done it. But
24 I don't remember specifically the specifics of related to
25 that.

