CHERYL JOYCE BIRKEY

Reiter v. TCA                                                                                          April 19, 2021

```
                                                        1                                                 3
                                                        1  DEPOSITION EXHIBITS MARKED:
                                                        2    NO.   DESCRIPTION                      PAGE
        IN THE UNITED STATES DISTRICT COURT             3    34  4/9/21 Email String from Cheryl     25
                                                                 Birkey to Wesley Jolly
           FOR THE DISTRICT OF COLORADO                 4
                                                             35  4/8/21 Email String from Wesley     28
         Civil Action No. 20-CV-1150-RBJ                5        Jolly to Wesley Jolly
  _____  6    36  4/8/21 Email String from Wesley     53
  Plaintiff(s):                                                  Jolly to Wesley Jolly
  SARAH REITER                                          7
  vs.                                                        37  4/9/21 Email String from Cheryl     55
  Defendant(s):                                         8        Birkey to Wesley Jolly
  THE CLASSICAL ACADEMY, a Colorado Charter School      9
  _____     PREVIOUSLY MARKED DEPOSITION EXHIBITS REFERRED TO:
                                                       10
  Scheduling Attorney for the Plaintiff Via Zoom:            NO.                                     PAGE
  MR. IAN D. KALMANOWITZ, ESQ.                         11
  Cornish & Dell'Olio, P.C.                                  11                                       51
  431 North Cascade Avenue, Suite 1                    12
  Colorado Springs, CO  80903                                17                                       40
  (719) 475-1204                                       13
  Atty. Reg. No. 32379                                       19                                       48
  ikalmanowitz@cornishanddellolio.com                  14
                                                             20                                       21
  **Appearances continued on page 2**                  15
                                                             27                                       17
                                                       16
  _____            30                                       35
                                                       17
        ZOOM DEPOSITION OF CHERYL JOYCE BIRKEY         18
                                                       19
          Reported Remotely Pursuant to the            20
      Colorado Governor Issued Executive Order D 2020 019
                           and                         21
                Colorado Secretary of State            22
       Notary Rules 8 CCR 1505-11, Section 1, Rule 5   23
                                                       24
                      April 19, 2021                   25
```

```
                                                        2                                                 4
  1  APPEARANCES CONTINUED:                             1       WHEREUPON, the following proceedings were had:
  2                                                     2                (Ms. Reiter is not present.)
     For the Defendant Via Zoom:                        3       THE REPORTER:  Good afternoon.  My name is
  3  MS. LINDSEY W. JAY, ESQ.                           4  Sandi Pelton of Pelton Reporting Service.  Today's date is
     Overturf McGath & Hull, P.C.                       5  April 19, 2021, and the time is approximately 1:32 p.m.
  4  625 East 16th Street                               6  This is the deposition of Cheryl Birkey in the matter of
     Denver, CO  80203                                  7  Sarah Reiter vs. The Classical Academy, a Colorado Charter
  5  (303) 860-2848                                     8  School, in the United States District Court for the District
     lwj@omhlaw.com                                     9  of Colorado.  Case No. 20-CV-1150-RBJ.
  6                                                    10       At this time I will ask counsel to identify
  7  Also Present Via Zoom:                            11  yourselves and whom you represent, and state your agreement
     Sarah Reiter                                      12  on the record that there is no objection to this deposition
  8                                                    13  officer administering a binding oath to the witness via
  9  PURSUANT TO NOTICE, the Zoom deposition of CHERYL JOYCE  14  videoconference.
 10  BIRKEY was taken on behalf of the Plaintiff, pursuant to the  15       MR. KALMANOWITZ:  Good afternoon.  Ian
 11  Colorado Rules of Civil Procedure, taken at the location of  16  Kalmanowitz on behalf of the plaintiff, Sarah Reiter.  I
 12  the deponent in Colorado Springs, Colorado, at 1:32 p.m.,  17  have no objection to conducting this deposition remotely, or
 13  remotely before Sandi K. Pelton, RPR, RMR, CRR.   18  having you issue a remote oath to the witness.
 14                                                    19       MS. JAY:  Lindsey Jay on behalf of The Classical
 15                                                    20  Academy, and no objections.
 16                   I N D E X                        21       THE REPORTER:  And to the witness, have any
 17                                                    22  objection to this method of conducting your deposition?
 18  DEPOSITION WITNESS:                         PAGE  23       THE WITNESS:  No.
 19  CHERYL JOYCE BIRKEY                               24            CHERYL JOYCE BIRKEY,
 20  Examination By Mr. Kalmanowitz:             5     25  the deponent herein, having been first duly sworn to state
 21
 22
 23
 24
 25
```



Pelton Reporting Service, Inc.   (719) 578-2062
www.peltonreporting.com

EXHIBIT F

**Page 5**

```
 1   the whole truth, testified on the oath as follows:
 2                       EXAMINATION
 3   BY MR. KALMANOWITZ:
 4       Q.   Good afternoon, Ms. Birkey.  My name is Ian
 5   Kalmanowitz.  I am Sarah Reiter's lawyer.  Nice to meet you
 6   virtually this afternoon.  Before we get started, I am going
 7   to ask the court reporter to record the video of this
 8   deposition, but in order for her to do that, she needs to
 9   have everybody's consent.  Will you consent to allow her to
10   record the video of the deposition?
11       A.   I consent.
12            MR. KALMANOWITZ:  Lindsey, do you have any
13   objection to that?
14            MS. JAY:  No objection.
15                     (Recording started.)
16   BY MR. KALMANOWITZ:
17       Q.   So, I guess because of the new -- new way that
18   the court reporter handled the oath and the objections, I
19   don't need to go through that anymore, which is nice.
20            But, Ms. Birkey, let me start out by asking you,
21   have you ever given a deposition before?
22       A.   No, I have not.
23       Q.   So, what we are going to do today is I am going
24   to ask you some questions, and hopefully I ask good enough
25   questions that you will be able to answer them.  And then
```

**Page 6**

```
 1   the court reporter is taking a transcript of everything that
 2   we say.  And, so, there is just a few ground rules I want to
 3   go over to make sure that the deposition runs smoothly,
 4   okay?
 5       A.   Yes.
 6       Q.   Great.  So, the most important thing for the
 7   court reporter to get a clear record is that we try not to
 8   talk over each other, and that we speak loudly enough that
 9   she can hear us both, and that we give verbal answers.  So,
10   I am going to do my best to wait until you are done
11   answering my questions before I start asking my next ones,
12   and I am going to ask that you do your best to wait until I
13   finish asking my questions before you start answering.  Is
14   that okay?
15       A.   That is okay.
16       Q.   Okay.  Great.  And while I can see you just fine,
17   I am having a little bit of a hard time hearing you.  I
18   don't know if you can move a little closer to the
19   microphone.  Maybe that might make it a little bit better
20   for me.  And go ahead and say something now and let me see
21   if I can hear you.
22       A.   Can you hear me better now?
23       Q.   Much better.  Perfect.  Thank you so much.
24   Great.  Now I can hear you fine and I can see you fine.  And
25   what will happen a lot is during the course of the
```

**Page 7**

```
 1   deposition you are going to see me, and you will shake your
 2   head yes, or you will shake your head no.  I understand what
 3   that means, but it doesn't show up on the transcript.
 4       A.   Correct.
 5       Q.   So, if you do that, and I say, "Is that a yes or
 6   is that a no," that's me just trying to get a clear record
 7   and not trying to be difficult, okay?
 8       A.   Okay.
 9       Q.   Great.  If you don't understand a question that I
10   ask, please let me know, and I will try to rephrase it in
11   a -- in a more clear or lucid way.  Is that all right?
12       A.   That is fine.
13       Q.   If you answer my question, I am going to assume
14   you understood it.  Is that okay?
15       A.   Yes.
16       Q.   Great.  If you need a break at any time for any
17   reason, just let me know, and we will stop and do what we
18   need to do to accommodate you, okay?
19       A.   Okay.
20       Q.   Great.  You are in your office today at
21   The Classical Academy?
22       A.   Correct.
23       Q.   Are you alone in your office?
24       A.   Correct.
25       Q.   Excuse me.
```

**Page 8**

```
 1       A.   I just did "do not disturb" on my phone, so it
 2   will stop ringing.
 3       Q.   Great.  Will you agree that you won't be
 4   communicating with anybody by text message or email or
 5   otherwise while the deposition is ongoing today?
 6       A.   I agree.
 7       Q.   Thank you.  What did you do to prepare for the
 8   deposition today?
 9       A.   Last Thursday I talked to Lindsey Jay, and she
10   gave me an overview of what a deposition is like.  And then
11   I reviewed the documents I provided to Wes Jolly regarding
12   videotaping policy that he had asked me a couple weeks ago.
13   And I reviewed my notes on two student cases I worked on
14   with Sarah Reiter.
15       Q.   Okay.  Can you describe for me the notes on the
16   two student cases that you worked on with Ms. Reiter?
17       A.   Yes.  There was one student who was named "AR"
18   who had to go on a safety plan, and then there was a
19   situation with a staff member, the head tutor, who was
20   allegedly making student support services kiddos do work
21   after lunch in the lunchroom.  And I assisted Sarah on both
22   of those complaints.
23       Q.   How extensive are your notes?
24       A.   They just pretty much say who did what.  I --
25   they are my recollection of what happened and who -- who we
```



---

**Page 9**

1  talked to, what order we did things.  For example, on the
2  lunchroom situation, I have notes that Don Stump was the one
3  who actually did the interview of the student, because it
4  was a staff complaint.  I did not do that.  So, that isn't
5  very extensive.  The other one is a couple pages.
6       Q.   Okay.
7       A.   Over a series of days of what we did interacting
8  with various staff members.
9       Q.   The -- the issue of the lunchroom, is that the
10 situation where a student -- student or students were being
11 required to, like, clean up the -- like, clean the floor in
12 the cafeteria after lunch?
13      A.   Yes.  And -- and Mr. Stump asked the head tutor
14 to not have any students do work duty, especially students
15 on IEPs.
16      Q.   Okay.  Have you provided copies of those notes to
17 Ms. Jay?
18      A.   Yes.
19      Q.   Okay.
20           MR. KALMANOWITZ:  Lindsey, would you agree to
21 produce those notes at the conclusion of the deposition?
22           MS. JAY:  We just got them on -- I think it was
23 Friday.  So, yes, absolutely.
24           MR. KALMANOWITZ:  Super.
25           MS. JAY:  And just -- just a reminder for

**Page 10**

1  everyone, for student names, if we could avoid using last
2  names and try and use initials, if possible.  Just to
3  protect the -- the confidentiality of those students.
4           THE WITNESS:  Will do.
5           MR. KALMANOWITZ:  Absolutely.  We will do that.
6  And in the event that anybody slips and forgets, let's just
7  have a standing agreement that the court reporter can redact
8  out the full names and only identify the students by
9  initials.
10          MS. JAY:  That sounds good.  Thanks.
11                (Discussion off the record.)
12          MR. KALMANOWITZ:  I will leave that up to you,
13 Lindsey.
14          MS. JAY:  Let me -- we should clarify, because I
15 believe there were two different students named "A."  So,
16 perhaps if we just give the one that she was referencing,
17 her initials, and you can fill in the initials for that
18 person.
19          THE WITNESS:  The one I was referencing was AR.
20 BY MR. KALMANOWITZ:
21      Q.   So, I'm sorry, Ms. Birkey, I was asking you about
22 what you had done to prepare for the deposition, and you
23 were telling me you reviewed the notes, and there were --
24 there were notes about a situation with a student AR, and
25 then there was a second set of notes about the tutor who was

**Page 11**

1  requiring students on IEPs to clean the cafeteria as some
2  sort of disciplinary matter, correct?
3       A.   Correct.
4       Q.   Okay.  And with respect to that situation
5  involving the cafeteria, you identified that as a situation
6  or case that you worked on with Ms. Reiter, right?
7       A.   Correct.
8       Q.   How did that -- how did that information about
9  the cafeteria situation come to your attention?
10      A.   Ms. Reiter told me -- I am the compliance officer
11 and Title IX coordinator at The Classical Academy.  I worked
12 on staff for the last eight years.  And the last seven years
13 I have been in charge of all student discrimination
14 complaints.
15           And then in the last year, I am now in charge of
16 all staff discrimination complaints.  I have been -- so,
17 Ms. Reiter reported the situation to me, because that is
18 what all administrators are trained to do.
19      Q.   Okay.  So, you -- have you worked for The
20 Classical Academy since 2013?
21      A.   Yes.
22      Q.   Okay.  And have you been the -- what is your job
23 title?
24      A.   I am the compliance officer and the Title IX
25 coordinator.  And I am in charge of all accreditation.  We

**Page 12**

1  are accredited through Academy District 20.  So, I help our
2  six principals with all of the accreditation process.  I
3  ensure all of our policies are up-to-date as a charter
4  school within the district, and I handle all discrimination
5  complaints, and I assist all administrators with legal
6  matters.
7       Q.   Have you been the compliance officer and Title IX
8  coordinator for the full eight years you have worked for
9  TCA?
10      A.   The first year I was with TCA, I was just the
11 compliance specialist.  I did everything I do now except
12 discrimination complaints.  My second year, I was asked to
13 become the contact for discrimination complaints for
14 students.  And in that year I began all of my training and
15 have had annual training since then.
16      Q.   Okay.  What -- what did you do before you came to
17 work at TCA?
18      A.   I worked for an international nonprofit religious
19 organization.  My last job there was -- I was the executive
20 director of legal operations.  And I was also board
21 secretary.  So, I did all of the filings on behalf of the
22 nonprofit both in each state, nationally, and around the
23 world.
24      Q.   Which -- which organization was that?
25      A.   It is now called Reach Beyond, and it is on



**Page 29**

 1  I believe the director of student support services, held a
 2  meeting with the mother.
 3          And they should have not met with the family
 4  until the student was officially offered a seat.  And in
 5  that meeting, the principal said some inappropriate comments
 6  such as, "We can't have the student on a skateboard."  The
 7  student got around with a skateboard.  And without
 8  consulting with the director of student support services and
 9  nurses, the principal just said, "No, we can't do that.
10  That is a safety hazard."
11          So, she pretty much said no without going through
12  the correct process for a student of disabilities.  The
13  principal was let go as a result of this situation.  But
14  then all of our admin had to go through 504 ADA training
15  because of her mistake.
16     Q.   Who was that principal?
17     A.   Susan Nosal.
18     Q.   How do you spell that last name?
19     A.   Last name is N-o-s-a-l.  First name, Susan.  And
20  all of our cabinet members, admin, and APs all attended this
21  training as a mediation for this family.
22     Q.   Okay.  Except for Mr. Jolly; is that right?
23     A.   Mr. Jolly could not attend.  And I can't recall
24  why.  But I provided the materials to him, I believe.
25     Q.   Okay.  Okay.  Was this the first time that a 504

**Page 30**

 1  and ADA training like this had been done?
 2     A.   Yes.  Besides our regular trainings, yeah.
 3     Q.   Okay.  I assume this was more in-depth than
 4  the -- the normal training that you do at the beginning of
 5  the year?
 6     A.   Yes.  Correct.
 7     Q.   Do you use the materials from this training --
 8  have you used the materials from this training to inform
 9  your own training now since July of 2019 on 504 and ADA
10  issues?
11     A.   I know policies were updated and handbooks were
12  updated, which means the training -- I think I -- I tweak my
13  training every year, so I would say, yes, I would have
14  tweaked it with this, with everything that happens.
15     Q.   Did this training, this 504 training in 2019,
16  cover the anti-retaliation provision of the Rehab Act?
17     A.   Say that again, please.
18     Q.   Did the training that took place on -- in July of
19  2019, the one that we are talking about here that is
20  identified in Exhibit 35, did it cover at all information
21  about the anti-retaliation provision of the Rehab Act?
22     A.   I don't recall that being -- and in it was mainly
23  how to treat disabled students and their families properly
24  and etiquette.
25     Q.   Are you familiar with the anti-retaliation

**Page 31**

 1  obligation contained within the Rehab Act?
 2     A.   When you say the "Rehab Act," it is -- I am
 3  familiar with anti-retaliation on all discrimination.  I
 4  wasn't aware there was one for just the disability act.
 5     Q.   Okay.  So, with respect -- so, you are not
 6  familiar with the specific anti-retaliation obligations in
 7  Section 504 of the Rehab Act, but you are familiar in
 8  general with the anti-retaliation obligations in the
 9  discrimination laws?
10     A.   I am not 100 percent sure what you are referring
11  to.  I do know we have to have a specialized hearing for any
12  504 and disability cases that are not required for others.
13  And I rely on our director of student support services to do
14  that.  That's what I am aware of, and what is in our current
15  policy.
16     Q.   Okay.  Do you have any knowledge about whether
17  Section 504 of the Rehab Act provides protection for
18  employees from retaliation?
19     A.   I would assume it does, because you can't
20  retaliate for any type of discrimination.  But I haven't
21  read that law in itself.
22     Q.   Okay.  All right.  Great.  Let me -- moving on.
23  Do you -- let's go back to the end of the 2017-2018 school
24  year.  And I want to ask if you remember having discussions
25  with Ms. Reiter about a situation where there were questions

**Page 32**

 1  about whether a student receiving special support services
 2  could be videoed.
 3     A.   Yes.
 4     Q.   Okay.  What do you remember about how you learned
 5  about that situation?
 6     A.   I believe Sarah called me and asked me to come to
 7  her office.  I went to her office.  She said that Dorothy
 8  Simpson had asked her to videotape an IEP kid -- student,
 9  excuse me -- and to show it to their parents and possibly
10  tell the parents that the student was not a good fit for
11  TCA.
12          When she told me that it involved an IEP student,
13  I said, "First of all, you can't videotape any student, let
14  alone an IEP student.  That is entrapment.  Let's notify
15  Jenny Combs" -- who was the director of student support
16  services at the time -- "ensure that the needs of this
17  student are being met, and I will pull together the
18  information regarding video -- videoing students."
19          So, I went to Wes Jolly, my supervisor, and
20  informed him of the report.  And he said -- he agreed with
21  me, we couldn't videotape any student, regardless of whether
22  they were on an IEP or not.  And we could only do it with
23  parent permission.
24          Jenny -- he was happy that I brought Jenny in.
25  And Jenny and I met.  We wrote through the video policy.



CHERYL JOYCE BIRKEY

Reiter v. TCA

April 19, 2021

33

1  Sarah had also alluded that some -- she said she had heard a
2  rumor that other students were being videotaped, too.  And
3  that was concerning to me.
4        So, Jenny Combs and I proposed to Wes that Wes
5  inform everyone on the academic lead team, which are deans
6  of educational philosophy, principals, and myself, that no
7  one can videotape a student for disciplinary reasons.  It is
8  considered entrapment.
9        If there is video occurring for other reasons, we
10 use D20's media policy.  At the beginning of the year, there
11 are about four or five policies you can -- will you let
12 your -- it is a media release, which includes images and
13 video.  For example, if we took pictures of a student and
14 wanted to put them in a school newsletter or in -- on the
15 website, we would have to go into Infinite Campus and ensure
16 that the parent had given us a media release.
17       So, if it was a permissible video situation, we
18 would have to have a release from the parent.  Wes was very
19 supportive.  He sent the information out to everyone on the
20 academic lead team:  "No videoing of students without
21 parental permission."  And never to do it for disciplinary
22 or for entrapment.  And then we discussed it, I believe, at
23 the next meeting.
24    Q.  Okay.  When you say you went to Mr. Jolly about
25 this issue to talk with him, did you meet with him in

34

1  person?  Did you talk to him on the telephone?  How did
2  that -- how did those communications happen?
3     A.  I can't recall how.  Usually -- his office is 100
4  feet from my office.  Before COVID, I would occasionally
5  stop in and just say, "Hey, how is it going?  Here it is."
6  Or if I was busy, I would pick up the phone and call him.  I
7  cannot recall.  I know it was verbal.  But I can't recall if
8  it was in person or on the phone, because I don't remember
9  the logistics of that day.
10    Q.  Do you remember about how much time you spent
11 talking with him about this issue?
12    A.  Very quickly.  I would say, "Dorothy Simpson
13 asked Sarah Reiter to do X."
14       I remember him replying, "You can't videotape any
15 student."
16       And I said, "I am notifying Jenny Combs to get
17 the student taken care of."  And I said, "Are you okay if I
18 put together a policy?"
19       And he said, "I will support you on it."
20    Q.  Okay.  In your first communication with
21 Mr. Jolly, did you tell him that it was Sarah Reiter who had
22 reported to you that Dorothy Simpson wanted to videotape the
23 student?
24    A.  I know I mentioned Dorothy's name.  And I am
25 85 percent sure I said Sarah's name.  I had to mention

35

1  Dorothy's name, because Dorothy reported to him.  And if he
2  wanted to do any corrective action, that's his prerogative
3  as a supervisor.  But I probably mentioned Sarah because it
4  was an administrator reporting it, which rises the level of
5  it.
6     Q.  Right.  Do you know if Mr. Jolly ever talked to
7  Ms. Simpson about this?
8     A.  I never talked to Wes about whether he takes
9  corrective action, but if someone who reports to him forgets
10 to do something in a -- forgets to do something in a case,
11 or I have to coach them, I always inform him of what I have
12 done, but I never inquire what he does, because that's an HR
13 matter, and I am not privy to that.
14    Q.  Okay.  Great.  Let's look at -- I am going to
15 show you what was previously marked as Exhibit 30.  And this
16 is an email from Ms. Reiter to you on April 24th.  Do you
17 remember this email?
18    A.  Yes, now that I see it.
19    Q.  Okay.  After you got this email from
20 Ms. Reiter -- actually, let me back up.  Strike that.
21       Was this email the first time that you had heard
22 from Ms. Reiter with questions about videoing of students?
23    A.  I don't recall if this happened first, or the IEP
24 student happened first, but I remember them happening weeks
25 apart.

36

1     Q.  Okay.  Do you remember if you responded to this
2  email?
3     A.  I always respond to emails.  If I didn't respond
4  to an email, I would have picked up the phone and called
5  her.
6     Q.  Okay.  That was going to be -- because I don't
7  have a -- I haven't seen an email in response to this, so I
8  was going to ask if you remember speaking with her, or
9  meeting with her.
10    A.  Okay.  Wes asked me if -- a couple -- a week or
11 two ago if I had anything on recording.  I searched all of
12 my emails by video recording and provided him with all of
13 the documents I had.  So, because I did that search two
14 weeks ago, I don't think I -- I didn't have this email, nor
15 did I have a response.  I probably picked up the phone and
16 called her.
17    Q.  Okay.
18    A.  And, again, this would be considered entrapment,
19 because the reason for doing it is behavior and discipline.
20 So, it would not be permitted.
21    Q.  Okay.  Do you think that you would have met with
22 or spoken with Ms. Reiter about this email on the same day
23 you got it, or --
24    A.  It would have been -- if I was in the office and
25 didn't have a meeting, I would have called her right away.



Pelton Reporting Service, Inc.   (719) 578-2062
www.peltonreporting.com