JENNY LYNN DIVITTO

Reiter v. TCA                                                                                                                                                 March 17, 2021

```
                                                                                                                3
                                                                  1                    I N D E X
                                                                  2
          IN THE UNITED STATES DISTRICT COURT                     3   DEPOSITION WITNESS:                    PAGE
              FOR THE DISTRICT OF COLORADO                        4   JENNY LYNN DIVITTO
           Civil Action No. 20-CV-1150-RBJ                        5   Examination by Mr. Kalmanowitz:          4
_____                    6
Plaintiff(s):                                                     7
SARAH REITER
vs.                                                                   DEPOSITION EXHIBITS MARKED:
Defendant(s):                                                     8
THE CLASSICAL ACADEMY, a Colorado Charter School
_____                         NO.   DESCRIPTION                    PAGE
                                                                  9
Scheduling Attorney for the Plaintiff Via Zoom:
MR. IAN D. KALMANOWITZ, ESQ.                                           19  4/25/2018 Email to Wes Jolly and    26
Cornish & Dell'Olio, P.C.                                        10        Jenny Combs from Cheryl Birkey
431 North Cascade Avenue, Suite 1                                11
Colorado Springs, CO  80903                                      12   PREVIOUSLY MARKED DEPOSITION EXHIBITS REFERRED TO:
(719) 475-1204                                                   13     NO.                                  PAGE
Atty. Reg. No. 32379                                             14      17                                    29
ikalmanowitz@cornishanddellolio.com                              15
                                                                 16
**Appearances continued on page 2**                              17
                                                                 18
    _____                       19
                                                                 20
         ZOOM DEPOSITION OF JENNY LYNN DIVITTO                   21
                                                                 22
           Reported Remotely Pursuant to the                     23
       Colorado Governor Issued Executive Order D 2020 019       24
                            and                                  25
                  Colorado Secretary of State
         Notary Rules 8 CCR 1505-11, Section 1, Rule 5

                       March 17, 2021
```

```
                                      2                                                                        4
 1   APPEARANCES CONTINUED:                                       1         WHEREUPON, the following proceedings were had:
 2                                                                2
     For the Defendant Via Zoom:                                  3               JENNY LYNN DIVITTO,
 3   MS. LINDSEY W. JAY, ESQ.                                     4   the deponent herein, having been first duly sworn to state
     Overturf McGath & Hull, P.C.                                 5   the whole truth, testified on the oath as follows:
 4   625 East 16th Street                                         6                     EXAMINATION
     Denver, CO  80203                                            7   BY MR. KALMANOWITZ:
 5   (303) 860-2848                                               8        Q.  Good afternoon, Ms. Divitto.  How are you?
     lwj@omhlaw.com                                               9        A.  I am well.  How are you?
 6                                                               10        Q.  Good.  Thank you.  My name is Ian Kalmanowitz.  I
 7   Also Present Via Zoom:                                      11   am Sarah Reiter's lawyer.  Thanks for making yourself
     Sarah Reiter                                                12   available this afternoon.
 8                                                               13        A.  Sure.
 9   PURSUANT TO NOTICE, the Zoom deposition of JENNY LYNN       14        Q.  I have a couple of preliminary matters to go
10   DIVITTO was taken on behalf of the Plaintiff, pursuant to   15   through before we get started.  The first one is that I have
11   the Colorado Rules of Civil Procedure, taken at the location 16  asked the court reporter to video the deposition, and she
12   of the deponent in Colorado Springs, Colorado, at 3:58 p.m.,17   won't do that unless everybody agrees.  So, will you agree
13   remotely before Sandi K. Pelton, RPR, RMR, CRR.             18   to allow her to do a video recording of the deposition?
14                                                               19        A.  Yes.
15                                                               20             MR. KALMANOWITZ:  Lindsey, are you okay with
16                                                               21   that?
17                                                               22             MS. JAY:  Yes.
18                                                               23                 (Recording started.)
19                                                               24   BY MR. KALMANOWITZ:
20                                                               25        Q.  Also, because of COVID, we are doing these
```



Pelton Reporting Service, Inc.   (719) 578-2062
www.peltonreporting.com

EXHIBIT

G

Page 29

1  your office where she disclosed that Dorothy Simpson had
2  asked her to video a student and show the video to the
3  student's parents?
4       A.   I mean, she may have.  I -- I don't recall it,
5  though.
6       Q.   Okay.  I am going to show you what has already
7  been marked as Exhibit 17.  I will ask you a question about
8  it.  Do you need me to zoom in on that, or are you able to
9  read it?
10      A.   No.  I can read it.
11      Q.   I can scroll down if you want to see the -- let
12 me start you at the beginning.
13      A.   Yeah.  That would be helpful.  It is just some
14 memory prompts, maybe.
15      Q.   That is where it was when I shared the screen.
16 It starts with this email from Ms. Reiter to Dorothy Simpson
17 and Mary Hawthorne.
18      A.   Okay.
19      Q.   I will scroll up.  That was Ms. Reiter's email to
20 Dorothy Simpson and Mary Hawthorne.  Here is Ms. Simpson's
21 response.
22      A.   Okay.
23      Q.   And then Ms. Reiter forwarded that email to you
24 and to Ms. Birkey.
25      A.   With the thoughts, yes.  And I don't believe I

Page 30

1  responded.
2       Q.   That was going to be my next question.
3       A.   I was probably hearing about Amy videoing
4  students in the past.  It is coming back to me now a little
5  bit.  I -- that was news to me, so to speak, because we
6  don't videotape students in schools.  I mean, that is
7  just -- it is common knowledge, I guess.
8            So, I probably went to Cheri and went down to her
9  office and talked to her like, "Did you know about this?"
10 So, that's probably why I didn't respond.
11      Q.   Okay.  What do you remember about the situation
12 with Amy and videotaping students?
13      A.   I don't recall anything about it.  Like I said, I
14 am not sure I had prior knowledge that that was going on.
15      Q.   Okay.
16      A.   If anything, this would be my only knowledge of
17 it, so to speak.
18      Q.   Got it.  So, it is the email statement about Amy
19 and videoing that makes you say, "Yes, I do remember now
20 receiving this email; not that I had prior knowledge about
21 Amy doing videoing"?
22      A.   Correct.  Correct.  Yeah.  This email probably
23 made me go, "Um, that's not right."
24      Q.   Do you remember what you and Ms. Birkey may have
25 discussed about these videoing issues?

Page 31

1       A.   Ms. Birkey and I were usually always on the same
2  page where I would, you know -- I don't remember
3  specifically walking down there, but I know she would have
4  agreed with me saying, "Yeah, no, we don't videotape
5  students."
6            And we probably had a conversation of, "We need
7  to kind of remind the administrative team at our next ALT
8  meeting about, you know, that we don't videotape students."
9            There is a D20 policy on it, I believe.  So, it
10 was probably around that just kind of, "Hey everybody,
11 remember, this is something that we don't do.  Here is our
12 policy.  Here is where to find it."  Those types of things.
13      Q.   Okay.  Can you think of a situation in which it
14 would be appropriate for Dorothy Simpson to request that an
15 assistant principal record a video of a student with an IEP
16 or a 504 plan?
17      A.   Absolutely not.
18      Q.   Can you think of a situation in which it would be
19 appropriate for a principal or an assistant principal at any
20 school to record a video of a student with an IEP or a 504
21 plan without the parents' prior permission?
22      A.   Not without parents' prior permission and an
23 educationally driven purpose.
24      Q.   What -- I mean, you have made it really clear
25 that we don't video students.  You know, why is it so clear

Page 32

1  to you that it is not appropriate for students to be
2  videoed?
3       A.   You know, it -- it can just open up a whole can
4  of worms.  First of all, they are minors.  And, so, you
5  are -- you know, you are using our personal cell phone
6  device to videotape or take pictures of a minor without
7  parent permission.  That in and of itself is problematic.  I
8  am sure you can connect the dots with that one.  You know,
9  no ill intent or not, it is just -- it is just not
10 appropriate behavior, and it is not something that has ever
11 been acceptable in schools.
12           And, secondly, it is not an appropriate behavior
13 management technique or behavior deescalation technique.
14 There is no educational purpose to it.  Unless you have
15 parent permission and you are using that, "Hey, parents,
16 here is what we are doing; here is how we responded," and
17 kind of review the tape afterwards as a training purpose of,
18 "Now when you said this, it escalated the student, or it,
19 you know, deescalated them.  And they were able to get back
20 on task in the classroom."  Those types of purposes.
21           But, you know, again, that would be done with
22 prior written consent from parents and an educationally
23 driven purpose.  And, you know, with other people in the
24 room.  It would never just be a staff member and a student,
25 per se.  There would be multiple people in the room so that

